**RUSTON GAS TURBINES, INC., and Ruston Gas Turbines, Ltd., Plaintiffs,**

v.

**PAN AMERICAN WORLD AIRWAYS, Defendant-Appellee,**

**Pinto Trucking Service, Inc., Defendant-Appellant.**

**No. 651, Docket 84–7834.**

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1985.

Decided March 7, 1985.

John L. Conners, New York City (Joanne Venino, Bigham, Englar, Jones & Houston, New York City, of counsel), for defendant-appellee.

Harry A. Gavalas, New York City (Alexander Lesyk, Vincent, Berg, Russo, Marcigliano & Zawacki, New York City, of counsel), for defendant-appellant.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

Deregulation of certain common carriers returns us to the common law. Only recently this court had occasion to consider the response of the common law to limitations of liability in agreements between a carrier and shipper, in *Shippers National Freight Claim Council, Inc. v. ICC*, 712 F.2d 740, 745–47 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). There we noted that "so long as the limitation was granted by the shipper in consideration for a lower rate of freight than would reasonably be charged for the carrier's unlimited liability" an agreement limiting a carrier's liability for loss of the shipper's property could be enforceable since "the carrier [is] entitled to know the extent of its potential liability for loss of the property and to be compensated in proportion to the risk assumed." *Id.* at 746 (citing, inter alia, *Hart v. Pennsylvania Railroad*, 112 U.S. 331, 340, 5 S.Ct. 151, 155, 28 L.Ed. 717 (1884)). As we said in *Shippers*,

> [S]o long as the limitation of liability was the result of a "fair, open, just and reasonable agreement" between carrier and shipper, entered into by the shipper "for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of risk," ... and the shipper was given "the option of higher recovery upon paying a higher rate," ... the agreement was enforceable at common law.

712 F.2d at 746 (quoting *Adams Express Co. v. Croninger*, 226 U.S. 491, 509–10, 33 S.Ct. 148, 153–54, 57 L.Ed. 314 (1913), and *Boston & Maine Railroad v. Piper*, 246 U.S. 439, 444, 38 S.Ct. 354, 355, 62 L.Ed. 820 (1918)).

Ruston Gas Turbines, Inc., and Ruston Gas Turbines, Ltd. (Ruston), contracted with Pan American World Airways to ship a series of turbines from London to Houston, Texas. Pan Am in turn engaged Pinto Trucking Service, Inc., a common carrier, to truck the turbines from New York's John F. Kennedy International Airport ("JFK") to Houston. Most of the turbines reached Houston without mishap, but one fell from the Pinto truck shortly after leaving JFK. Pan Am paid Ruston in full for the damage, $192,029.00, plus prejudgment interest in the sum of $57,928.75, the total loss falling short of the $9.07 per pound liability limit established by the Warsaw Convention.[1] Pan Am then sought and obtained indemnity against Pinto. The only question on this appeal is whether Pinto is liable for Pan Am's entire expense of $249,957.75 or whether Pinto's liability is limited to the amount stated in its bill of lading— $.50 per pound for shipments weighing in excess of 100 pounds, or $15,574 for the 31,148-pound turbine—plus prejudgment interest. The United States District Court for the Southern District of New York, Mary Johnson Lowe, Judge, held for Pan Am for reasons below stated. We reverse.

The parties stipulated that the rates tariff filed by Pinto with the Interstate Commerce Commission (ICC) prior to deregulation provided for a base transportation rate of $2,720 for movements from JFK to Houston, applicable to shipments weighing more than 100 pounds only when released to a value of $.50 per pound. A different tariff outlining rules and regulations, ICC–PNTS–100–A, also offered three released valuation alternatives, including one permitting release to a value not exceeding $9.07 per pound, the upper limit of Pan Am's liability under the Warsaw Convention, upon payment of the base transportation rate plus 10%.

Pinto's authority under regulation to issue these alternative rates is somewhat suspect. Pinto claimed to derive authority for ICC–PNTS–100–A from two ICC Released Rates Orders, No. MC–638 of October 12, 1965, and No. MC–949 of October 26, 1977. However, the tariff rates differed from those authorized in both No. MC–638 and No. MC–949. Moreover, Pinto

---

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, *opened for signature* Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, *reprinted in* 49 U.S.C. following § 1502.

was neither a member of the National Motor Freight Traffic Association, Inc., which requested the authority granted in No. MC–638, nor included in the group covered by No. MC–949, which consisted of carriers who participated in the motor freight tariff of the Air Freight Motor Carriers Conference, Inc.

However questionable Pinto's tariffs may have been while No. MC–638 and No. MC–949 were in effect, the ICC Released Rates Orders ceased to apply to shipments like that at issue here on July 1, 1980, when the deregulatory statute removed ICC jurisdiction over transportation of property by motor carrier, if that transportation is immediately preceded or followed by transportation by air. 49 U.S.C. § 10526(a)(8)(B) (1982). Pinto was thereafter free to make contracts of limited liability when continuing a shipment begun by an air carrier such as Pan Am, provided it afforded a choice of rates and was otherwise in compliance with the requirements of the common law.

Having reasonable rates, rules and regulations already in place, Pinto decided to continue to operate under its tariffs after deregulation, with its usual form of bill of lading incorporating the tariffs and their liability limitation by reference. It implemented this election by letter to all of its customers, dated July 24, 1980, reading:

> As a result of the Motor Carrier Act of 1980 deregulating air freight, we wish to advise you that all rates, rules and regulations found in Pinto tariffs PNTS 100 and PNTS 200 remain the basis for all traffic to be moved hereafter, whether regulated or non-regulated.

Pinto supplemented this notice in a letter dated October 8, 1980, which both alerted Pan Am to the limitation of liability in the tariffs and offered to negotiate that limitation:

> At the present time our coverage at the base rate is limited to fifty cents (50¢) per pound. However, for a surcharge of ten per cent (10%) of the rate, we do extend coverage to the Warsaw Convention Nine Dollars and Seven Cents ($9.07)

per pound. Pinto would be most happy to discuss this surcharge and to conceivably negotiate that matter with you.

In addition, the January 10, 1981, bill of lading for the ill-fated turbine shipment here at issue declared that the goods were "RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading," and further that "[u]nless a Greater Value is Declared Herein, the Shipper Agrees and Declares that the Value of the Property is Released to an Amount Not Exceeding $50 for Any Shipment of 100 Pounds or Less and Not Exceeding 50 Cents Per Pound for Shipments Weighing in Excess of 100 Pounds."

Despite these repeated warnings of liability limitations, Pan Am never declared a higher value to cover its potential liability up to $9.07 per pound, either for this shipment or for at least eight prior and subsequent shipments from London to Houston for the account of the same shipper and consignee by Pan Am to JFK and by Pinto from JFK to Houston. Evidently, Pinto and Pan Am did not agree on a rate to cover Pan Am's full liability until July 13, 1982, over a year and one-half after the shipment in question here, at which time Pinto agreed to waive its 10% surcharge to achieve the Warsaw Convention cargo insurance.

Negotiations to lower the base transportation charge for trucking the turbines reached a more rapid resolution. While the rate published in the tariffs was $2,720, Pinto agreed to do the trucking for $2,500 by letter of October 22, 1980, an offer that Pan Am accepted by performance in shipping the first turbine on November 3, 1980, for the quoted amount.

### Discussion

 Under common-law principles of carriage, the question is whether Pan Am and Pinto made a "fair, open, just and reasonable agreement" to limit Pinto's liability for the damaged turbine to $.50 per pound. *Adams Express Co. v. Croninger*, 226 U.S. 491, 509, 33 S.Ct. 148, 153, 57 L.Ed. 314 (1913). There is no doubt that

Pan Am was on notice of Pinto's limited liability and choice of rates by virtue of the letters of July 24, 1980, and October 8, 1980, the bill of lading, and the tariffs. It is equally clear that Pan Am, itself a sophisticated business enterprise well familiar with released values and limitations of liability, proceeded not to declare a higher value. With deregulation, Pinto's tariffs coupled with its correspondence served in effect as an offer for a negotiated contract of carriage; when the forewarned, commercially knowledgeable Pan Am accepted that offer by performance without taking the opportunity to declare a higher value, it implicitly agreed to the liability limitations incorporated into Pinto's tariffs.

The district court found, however, that Pinto could not rely upon its tariffs to limit its liability because it did not charge the tariff rate but rather the lower negotiated rate of $2,500. The court also found that Pinto, unable to rely on the choice of rates in its tariffs, had not proved its compliance with the common-law requirement of offering alternative rates keyed to value. We are forced to disagree. After deregulation, Pinto's only reliance on its tariffs was to claim that they gave proper notice of its limited liability. Therefore, it is unnecessary to decide whether negotiating a change in one tariff term calls into question the other terms. Moreover, Pinto's letter of October 8, 1980, to which the trial court gave insufficient consideration, spelled out both the liability limitation at the base transportation rate and the higher rate available to obtain full coverage up to the Warsaw Convention ceiling. Thus, Pan Am had the option of obtaining a $9.07 per pound released value simply by paying 10% over the negotiated base transportation rate, the same option it would have had if the parties had used the base transportation rate of the original rates tariff.

■ Pan Am makes two other arguments attacking Pinto's reliance on its tariffs. The first is that Pinto had no authority under 49 U.S.C. § 20(11) (1976) to establish released value ratings in its tariffs. Section 20(11) declared all limitations of liability "unlawful and void" unless "expressly authorized or required by order of the Interstate Commerce Commission." Pan Am argues that Pinto had no such express authorization, since neither Released Rates Order No. MC–638 nor Released Rates Order No. MC–949 was applied for on its behalf. But this argument is beside the point. This case presents only a problem of common-law contract. Whether the tariffs were "authorized" or "enforceable" when filed does not affect Pinto's ability after deregulation to use them as the basis for a contract. Cases like *Caten v. Salt City Movers & Storage Co.*, 149 F.2d 428 (2d Cir.1945), or *Glickfeld v. Howard Van Lines, Inc.*, 213 F.2d 723 (9th Cir.1954), involving noncompliance by carriers with ICC orders, are simply inapposite. The same holds true of *Boston & Maine Railroad v. Piper*, 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820 (1918), and *Peter Condakes Co., Inc. v. Southern Pacific Co.*, 512 F.2d 1141 (7th Cir.1975), cited to us by Pan Am. Those cases stand for the proposition that liability limitations that are in contravention of the statute then in effect are null and void even when bearing the approval of the ICC. Here the statute is no longer applicable; we are simply talking about common law.

Pan Am also argues that the bill of lading and tariff limitation of liability provisions were null and void because of Pinto's repeated deviations from the release orders. Pan Am points out two such "deviations": (1) the excess value charges in Pinto's tariff differed from those in the ICC orders, and (2) while the released value on Pinto's bill of lading of $.50 per pound for shipments weighing more than 100 pounds followed Released Rates Order No. MC–638, it did not comply with No. MC–949, which called for a released value not exceeding $9.07 per pound. The trial court seemed troubled by both points, and indeed, had the shipments here in issue been made under ICC regulation, we might well have shared the trial court's concern. After deregulation, however, we must dismiss all of Pan Am's arguments as irrelevant. The fact remains that this contract was

negotiated between people of at least equal economic stature and commercial awareness or acuity. In this posture, the contract should be enforced.

Judgment reversed.