**MECHANICAL TECHNOLOGY INCOR-
PORATED, Plaintiff-Appellee,
Cross-Appellant,**

v.

**RYDER TRUCK LINES, INC.,
Defendant-Appellant,
Cross-Appellee.**

**Nos. 145, 214, Dockets 85–7364, 85–7460.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 11, 1985.

Decided Nov. 14, 1985.

Bohl, Clayton, Komar & Della Rocca,
P.C., Albany, N.Y. (Howard D. Clayton,
Stephen A. Pechenik, of counsel), for de-
fendant-appellant, cross-appellee.

Dwyer, Dwyer & Waite, Albany, N.Y.,
for plaintiff-appellee, cross-appellant.

Before KAUFMAN, MESKILL, and
WINTER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Since the dawn of this century, the high-
ways of our nation have served as the
arteries of a burgeoning interstate com-
merce. Although their wares may now be
products of the technological revolution,
commercial shippers still turn to trucks for
safe and inexpensive transport. Similarly,
shippers have for decades enjoyed the op-
portunity to contractually choose between
full recovery for damage and low shipping
costs.

In this appeal, we are called upon to
interpret the explicit and implicit terms of
such a contract. A shipper, Mechanical
Technology Incorporated ("MTI"), sued a
common carrier, Ryder Truck Lines, Inc.
("Ryder"), for damage to MTI computer
equipment shipped via Ryder trucks. Ry-
der appeals from a judgment awarding
damages to MTI in the amount of $171,360.
Although agreeing that Ryder is liable, we
hold that Ryder's liability was contractual-
ly limited, and consequently reduce MTI's
award to $22,175. We also believe that a
cross-appeal by MTI for pre-judgment in-
terest is without merit.

The facts of this commercial dispute are crucial to the resolution of the legal questions presented. We therefore carefully delineate the factual setting of this appeal.

## I. BACKGROUND

Ryder is a national trucking firm. As authorized by 49 U.S.C. § 10730, Ryder has properly filed and published with the Interstate Commerce Commission a tariff listing several freight rates available to shippers of data processing equipment.[1] Each rate carries a corresponding level of liability per pound, which is termed a "released rate." A higher freight rate, therefore, secures a higher level of liability. The tariff expressly provides that if the shipper fails to state a released rate, then the shipment is deemed released at a rate of $5.00 per pound. Similarly, a released rate of $5.00 is presumed if the shipper designates a level of liability in excess of $25.00 per pound.

To fulfill its contractual requirements with the United States Air Force, MTI purchased and readied for shipment twelve items of computer equipment. The total weight of the pieces was 4,435 pounds. Douglas Halgren, an MTI supervisor, selected Ryder to transport the equipment from Latham, New York, to Kelly Air Force Base in San Antonio, Texas. Ryder, however, used only ordinary freight trailers, which lacked the means of adequately securing goods against damage in transit. Generally, computer goods are shipped via air-ride vans equipped with an elaborate suspension system. Although warned by fellow MTI employees that Ryder did not use air-ride vans, Halgren insisted on contracting with Ryder for shipment of the computer equipment to San Antonio.

In preparation for shipment, another MTI employee, Michael Ciani, prepared a shipping order individually listing the pieces of computer equipment. Ciani marked the shipping order "Prepaid" and "Insure for $238,000." Working from the shipping order, MTI's shipping clerk, Bernard Izzo, completed a bill of lading on one of MTI's own forms. Near the top of the bill of lading was a notice in small but readable print: "RECEIVED, subject to the classifications and tariffs in effect on the date of the receipt by the carrier...." In addition to describing the goods to be shipped, Izzo also made the notations "Prepaid" and "Insure for $238,000" on the form. Izzo, however, did not fill in the section bearing this legend:

> NOTE—When the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. *The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____*

Ryder's driver accepted the goods on February 23, 1981, and signed the bill of lading, with the spaces for released value left blank.

The equipment, carried solely by Ryder trucks, arrived in Texas in damaged condition. MTI thereupon purchased replacement computer parts to meet its contractual obligations at an additional cost of $171,360.

On August 13, 1982, MTI filed a complaint in New York Supreme Court, alleging breach of contract and negligence by Ryder. On the basis of diversity jurisdiction, Ryder successfully petitioned for removal of the action to the United States

---

1. The tariff provides in relevant part:

   NOTE—The released or declared value must be entered on the shipping order and bill of lading at time of shipment in the following form:
   *'The agreed or declared value of the property is hereby stated by the shipper to be not exceeding $_____ per pound.'*
   If the shipper fails or declines to execute the above statement or designates a value exceeding $25.00 per pound, shipment will not be accepted, but if shipment is inadvertently accepted, it will be considered as being released to a value of $5.00 per pound and the shipment will move subject to such limitation of liability.
   (The released values upon which the classes herein are dependent have been authorized by the Interstate Commerce Commission by Released Rates Order No. MC–894 of May 10, 1977 as amended August 10, 1979, subject to complaint or suspension.)

District Court for the Northern District of New York. At trial, Ryder made an offer of proof concerning its tariff for computer equipment. The district judge, however, rejected the offer and ruled as a matter of law that the limitations of liability contained in the tariff did not apply.

After denying Ryder's motion for a directed verdict, the district court submitted four interrogatories to the jury. The jury returned a special verdict that 1) MTI delivered the equipment to Ryder in good condition; 2) the equipment arrived in damaged condition; 3) Ryder failed to prove its own lack of negligence *and* failed to prove any exculpatory cause of damage; and 4) MTI sustained damages of $171,360. Accordingly, on February 14, 1985, Judge Miner ordered that judgment be entered in favor of MTI in the amount of $171,360.

Following entry of judgment, Ryder moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. Judge Miner denied the motion on April 2, 1985. Ryder timely filed a notice of appeal. MTI made a motion for prejudgment interest on April 4, 1985, and now cross-appeals from the district court's denial of that motion.

## II. DISCUSSION

■ Although federal jurisdiction was predicated on diversity of citizenship, we draw our rule of decision from 49 U.S.C. §§ 10730 and 11707 (1982).[2] Section 11707 provides that a common carrier is liable for "actual loss or injury" to the property it transports. At trial, Ryder failed to rebut the presumption of liability imposed by the statute. Accordingly, we reject Ryder's claim that the district court erred in not granting its motions for a directed verdict and judgment n.o.v., and affirm the finding of liability against Ryder.

Turning to the central issue on appeal, we must decide whether MTI agreed to

limit Ryder's liability. Section 10730 provides that a shipper by "written declaration" or "written agreement" may agree to limit the carrier's liability in return for a lower freight rate. Rejecting the reasoning of the district court, we hold that the bill of lading was adequate, when read with the tariff, to establish a released rate of $5.00 per pound.

The court below relied almost exclusively on our decision in *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619 (2d Cir.1980). In *Mooney*, this Court stated that a limitation of liability applied only if the bill of lading contained either the reduced freight rate or the released value of the property. *Id.* at 626. Finding no such rate or valuation on MTI's bill of lading, the district court ruled that Ryder's liability had not been effectively limited.

This ruling, however, failed to give sufficient consideration to the provisions of the tariff. Quoting from *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103, 108 (1st Cir.1978), Judge Miner acknowledged that "shippers are charged with notice of terms, conditions, and regulations contained in the tariff schedule...." The tariff expressly provides that failure to designate a rate results in a released rate of $5.00 per pound. By leaving the spaces blank, MTI effectively selected the lowest freight rate and its corresponding low level of liability. Having had the opportunity on its own form to secure greater protection, MTI "cannot complain about the consequences of leaving the applicable spaces blank...." *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.*, 596 F.Supp. 515, 517 (E.D.Pa. 1983). We recently reached a similar conclusion in *Ruston Gas Turbines, Inc. v. Pan American World Airways*, 757 F.2d 29 (2d Cir.1985).

It is true, as MTI contends, that the shipper in *Ruston* had actual notice of the carrier's tariff. MTI vehemently asserts that it had no knowledge of the various

**2.** Previously codified as 49 U.S.C. § 20(11),    these sections are commonly termed the Car-

rates,[3] and we have not previously found that a shipper agreed to limit liability on the basis of constructive knowledge alone. Nonetheless, we do not hesitate to reach this conclusion on the specific facts of this case. As in *Ruston*, "this contract was negotiated between people of at least equal economic stature and commercial awareness or acuity." 757 F.2d at 32–33. MTI's own form incorporated the applicable tariff and provided for designation of a released rate. Moreover, MTI was an experienced shipper and was not forced to employ Ryder. Indeed, Halgren insisted on using Ryder, although he had been warned that damage might well result. Finally, we believe it is especially appropriate to charge MTI with knowledge of a tariff specifically tailored to shipment of computer goods. The various rates listed in Ryder's tariff provided MTI with a "fair opportunity to choose between higher and lower liability by paying a correspondingly greater or lesser charge...." *New York, New Haven & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953).

In addition to its lack of knowledge, MTI claims that the notation "Insure for $238,-000" indicates that full liability on Ryder's part was desired. Ordinarily, we might find this argument compelling. The factual context surrounding this shipment, however, diminishes substantially the notation's significance. Izzo merely placed the insurance request on the bill of lading because it was part of the shipping order. Nothing on the shipping order indicated that Ryder was to insure the goods. In fact, the record indicates that Aetna Casualty & Surety Co. independently insured the shipment.[4]

More significantly, a request to insure the goods for their full worth would in this case be equivalent to designating a released rate of approximately $54.00 per pound. Again, a section of the tariff would specifically apply. When a shipper specifies a released rate in excess of $25.00 per pound, the tariff provides that the goods will be subject to a rate of $5.00 per pound.

The district court should therefore have ruled that the bill of lading effectively limited Ryder's liability to $5.00 per pound. The shipment weighed 4,435 pounds. Accordingly, we hold that Ryder is liable to MTI in the amount of $22,175.

We add that our holding is consonant with the relationship that the ICC envisaged between shippers and carriers of computer goods. In approving the freight and released rates on which Ryder based its tariff, the Commission warned that unlimited liability for damage to data processing equipment "could be extremely harmful to large carriers and catastrophic to small carriers." Release Rates Order No. MC–894, 353 I.C.C. 661, 670 (1977). The ICC also found "unwarranted" fears that commercial shippers would not be able to purchase "spot" insurance in lieu of carrier liability. *Id.* at 669.

■ Finally, we caution that our holding should not be taken as a retreat from the historic presumption that shippers are able to recover for damaged goods. The existence of a tariff is not in itself sufficient to limit liability. At the same time, a carrier is "entitled to know the extent of its potential liability for loss of the property and to be compensated in proportion to the risk assumed." *Shippers National Freight Claim Council, Inc. v. Interstate Com-*

---

mack Amendment.

**3.** MTI's precise relationship with Ryder was not elucidated at trial. Izzo, the shipping clerk, testified that he had no knowledge of Ryder's various rates, but on cross-examination admitted that his duties did not include selection of a freight rate. Halgren's rationale for choosing Ryder remains a mystery because the district judge denied Ryder's motion to depose him. We also note that the shipping order was marked "Prepaid", thereby indicating that the parties had an agreement on a rate. MTI, however, was not billed until after the goods were damaged.

**4.** The district court did not admit evidence of the Aetna insurance coverage, ruling that its probative value would be outweighed by the prejudicial effect of calling to the jury's attention the liability of an insurance company.

*merce Commission,* 712 F.2d 740, 746 (2d Cir.1983). When a sophisticated shipper, using his own bill of lading form, leaves blank the space provided for declaring the released value of the goods, we will presume that he did so deliberately with full knowledge of the consequences under the applicable tariff.[5]

## III. THE CROSS–APPEAL

■ MTI's cross-appeal from the district court's denial of its motion for pre-judgment interest is time-barred. Fed.R.Civ.P. 59(e) provides that motions to amend a judgment must be made within 10 days of the entry of judgment. MTI made its motion on April 4, 1985, forty-nine days after judgment was entered. Seeking to evade this barrier, MTI asserts that interest should be added as a matter of law, thereby characterizing its motion as one for a correction of a clerical error. Fed.R.Civ.P. 60. This characterization is wholly unpersuasive. In the cases on which MTI relies, pre-judgment interest was either granted at the discretion of the trial court, see *Gardner v. Mid-Continent Grain Co.,* 168 F.2d 819, 825 (8th Cir.1948), or was awarded pursuant to state law. *See Menendez v. Saks & Co.,* 485 F.2d 1355, 1374 (2d Cir. 1973). Accordingly, Judge Miner properly denied MTI's motion.

## IV. CONCLUSION

The judgment of the district court is affirmed in part and reversed in part, and the cause is remanded to the district court with directions to enter judgment in favor of MTI in the amount of $22,175.

WINTER, Circuit Judge, concurring in the result:

Although I believe the majority reaches a desirable result, I would have preferred an opinion that provided greater clarification of the law in this area.

The commercial context in which this case must be decided involves the interrelationship of freight rates, limitations on the liability of carriers for loss of or damage to goods, and insurance covering shippers and carriers for such loss or damage. Carriers file tariffs containing limitations of liability geared to various freight rates, and insure themselves accordingly. Shippers can then select the mix of freight rate, limitation of liability, and insurance premium most desirable to them. In this commercial context, all parties—shippers, carriers, insurance companies, and courts—will benefit from rules of law that allow easy determination of liability for loss or damage, thereby reducing the need for litigation, the cost of insurance, and ultimately freight rates. Whether shippers or carriers generally win in these cases is, therefore, less important than whether the law draws bright lines.

Judge Miner understandably relied upon *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.,* 616 F.2d 619 (2d Cir.1980). Like the present case, *Mooney* involved a tariff and a standard bill of lading, and rather clearly held that a tariff provision specifying a limitation of liability is not effective when the bill of lading does not specify either a reduced freight rate or the released value of the property. *Id.* at 626. This ruling, in conjunction with *Ruston Gas Turbines, Inc. v. Pan American World Airways,* 757 F.2d 29 (2d Cir.1985), where the shipper was held to be bound by the limitation because it had actual knowledge of the tariff, established a rule that when a bill of lading does not specify either a reduced rate or released value, and the shipper has no actual knowledge of the terms of the tariff, limitations of liability contained in the tariff are not effective. By implication, a tariff provision like the one in the present case, which specifies a particular limitation

---

**5.** Although our colleague's call for a bright line is appealing, we are not convinced that every failure properly to complete the bill of lading would represent a "fair opportunity" to choose a lower level of liability. *New York, New Haven & Hartford R.R., supra,* 346 U.S. at 135, 73 S.Ct. at 990. Moreover, the suggested bright line would then make the relevant question whether the bill of lading incorporated the tariff, an issue also capable of breeding disagreement and litigation.

when a bill of lading is not filled out properly, would also be ineffective absent actual knowledge on the shipper's part. *Sub silentio*, the present opinion discards this body of law.

The new rule requires that the trier of fact take the sophistication of the commercial shipper and the origin of the particular bill of lading into account. Because actual knowledge of the tariff on a shipper's part will defeat any attempt to avoid its terms, the shipper's sophistication is relevant only to whether it ought to have known of the provisions of the tariff. Certainly it has nothing to do with relative bargaining power, since such a concept, whether or not an otherwise valid consideration, is irrelevant where an established tariff allows *all* shippers to choose among various rates and limitations on a carrier's liability.

The legal relevance of the origin of the bill of lading is less clear. It is surely not an application of the familiar canon of construction that contracts are construed against the drafter. In the present case, the bill of lading employed by MTI is a standard form upon which MTI merely stamped its name and address. The relevant language with regard to declared value is virtually the identical language *required by Ryder's tariff* to be in *every* bill of lading. Whether Ryder or MTI provided the bill of lading form is thus of no importance since whatever its origin it would have contained identical language.

District courts will not find it easy either to reconcile this decision with *Mooney* or to fashion a charge to a jury embodying the rule of the present case. Although the legal theory adopted purports to be fact-specific, the majority does not remand for a trial on the limitation of liability defense but rather disposes of the case as a matter of law. Because Judge Miner ruled that the limitation on liability was legally ineffective, MTI has had no opportunity to litigate the factual issue of its sophistication as a shipper. Nevertheless, the majority rules against MTI on this issue even though it was never consciously addressed by either party at trial. This disposition, in conjunction with other ambiguities pervading the decision's legal theory, portends that its principal effect will be to breed litigation.

I concur in the result, however, at least in light of the majority's disregard of *Mooney*. MTI's failure to complete the bill of lading led to its paying the lowest freight rate. I would hold MTI to the limitation on liability that corresponds to the rate paid. A legal rule that allows commercial shippers such as MTI to evade a limitation on liability when they fail to fill out a bill of lading and claim ignorance of the terms of the tariff would be inefficient. In such cases, the shippers have far greater knowledge of the value of the goods shipped than do the carriers. The shippers are therefore in a better position to evaluate the risk accurately, to fill out the bill of lading, and to purchase the correct amount of insurance. A rule invalidating a limitation on liability where a commercial shipper claims lack of knowledge will lead to overinsurance and to an increase in freight rates. Carriers will have to insure against the risk of litigation over claims by shippers of ignorance of the tariff and against the possible exposure to full liability for damage to or loss of goods of uncertain value. They will in turn have to raise those freight rates which are geared to unreliable limitations of liability. Meanwhile, shippers will also continue to purchase insurance to cover risks above the limitation on liability which they bear as a consequence of the uncertainties of litigation. I would therefore hold commercial shippers who fail to fill out a bill of lading properly to the limitation on liability that corresponds to the freight rate paid.