ASSET MANAGEMENT & CONTROL, INC., Plaintiff,

v.

ABF FREIGHT SYSTEM, INC., Defendant.

No. 97–CV–0941 LEK/DNH.

United States District Court, N.D. New York.

July 10, 1998.

188

Office of Francis E. Ferro, P.C., Milton, New York, for plaintiff; Francis E. Ferro, of counsel.

McNamee, Lochner, Titus & Williams, P.C., Albany, New York, Barry N. Gutterman & Assoc., New York City, for defendant;

Barry N. Gutterman, G. Kimball Williams, of counsel.

## AMENDED DECISION AND ORDER

KAHN, District Judge.

Pursuant to Fed.R.Civ.P. 60(a), the Court enters this Decision and Order amending its decision filed June 30, 1998.

■ This is an action against a motor carrier for damage allegedly done to used computer systems while they were within the carrier's possession. Originally brought in state court, the action was removed on July 3, 1997 by defendant on grounds of federal question jurisdiction under the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10101, et seq.[1] Presently before the Court is defendant's motion for partial summary judgment on the issue of damages.

### I. Facts

Plaintiff Asset Management & Control, Inc. ("AMC") is engaged in the business of reselling used data processing machines purchased from International Business Machines Corporation ("IBM"). These purchases are conducted in accordance with the terms of an express agreement between AMC and IBM entered into on or about February 15, 1995.

On or around February 7, 1996, IBM delivered such a shipment to defendant ABF Freight System, Inc. ("ABF Freight") for delivery by truck to AMC. Although it was normal practice for AMC to pay the cost of freight, this particular shipment was prepaid by IBM. On the bill of lading, IBM specified that the value of the property did not exceed $5.00/pound. Jones Aff.Exh. A. On the same form, the goods were described in typed letters as "Machine, Systems Or Devices Data Processing Or Parts," a designation that refers to a particular section of defendant's tariff schedule. Underneath this was written "8 Pallets of electrical equipment." *Id.* Although the weight of the shipment was not specified on the bill of lading, IBM paid the defendant for a shipment of 2,400 pounds.

■ The equipment was packed, palletized, loaded onto the train and secured by IBM. It appears that this was done inadequately for upon receipt, plaintiff discovered that the equipment had been damaged. Plaintiff has brought this suit against defendant ABF Freight for recovery.[2]

In support of its motion for partial summary judgement on the issue of damages, the defendant argues that it has effectively limited its liability to a maximum of 10 cents/pound and that the weight of the cargo was 2,400 pounds. Thus, defendant argues, its liability is at most $240.00. Plaintiff asserts that the defendant's maximum liability is $30,725.00.

### II. Discussion

#### A. Standard of Review

Under Rule 56(c), summary judgment:

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fed. Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The

---

1. State law actions relating to the shipment of goods by interstate carriers are preempted by ICA. *See Toledo Ticket Co. v. Roadway Express, Inc.,* 133 F.3d 439, 441 (6th Cir.1998). Specifically, 49 U.S.C. § 14706(d) allows a private party to bring an action against an interstate motor carrier for damage to goods. Under 28 U.S.C. § 1445, such actions may be removed if the

matter in controversy exceeds $10,000.00. Here, plaintiff seeks $30,725.00.

2. Plaintiff as consignor may recover on the contract between the shipper and carrier and is conversely bound to its restrictions. *Burnell v. Butler Moving & Storage,* 826 F.Supp. 65, 68–69 (N.D.N.Y.1993).

substantive law determines which facts are material to the outcome of a particular litigation. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Hurwitz v. Sher*, 982 F.2d 778, 780 (2d Cir.1992), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *Trans Sport v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (stating that "the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise") (citations omitted). Only when it is apparent, however, that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). With this standard in mind, the Court turns to the substance of defendant's motion.

### B. Alleged Defects of Plaintiff's Opposition Papers

■ Defendant argues that an affidavit submitted by Michael Bange, put forward by plaintiff as an expert, should be excluded because the expert was not timely disclosed. The Uniform Pretrial Order required plain-

tiff to disclose rebuttal experts at least 30 days prior to March 1, 1998. Uniform Pretrial Order, Dkt. # 3, at ¶ 6(a)(4). Plaintiff does not dispute that Michael Grange was not disclosed by the deadline. The Uniform Pretrial Order also states that "the Court will preclude the testimony of any experts not disclosed [in a timely fashion.]" *Id.* at ¶ 6(b). Therefore, the Court will not consider Grange's affidavit in its decision.

■ Defendant also argues that because plaintiff has not submitted a statement stating those facts of which it asserts there is a genuine dispute with citations to the record in compliance with N.D.N.Y.L.R. 7.1(f), the facts as stated in defendant's 7.1(f) statement must be accepted. It is true that plaintiff has not submitted a separate statement labeled as a 7.1(f) statement. However, it has submitted an affidavit from Nicholas J. Magliato ("Magliato"), president of AMC, in which he states which facts are disputed and includes citations to the record. The Court therefore finds that N.D.N.Y.L.R. 7.1(f) does not require a presumption that defendant's facts are correct where those facts are disputed by Magliato.

### C. Effective limitation on liability

Defendant argues that it has limited its liability by agreement with IBM to 10 cents/pound and that the weight of the shipment is 2,400 pounds, for a maximum liability of $240.00. Plaintiff argues that liability was expressly limited in the bill of lading to $5.00/pound and that the actual weight of the cargo was 6,145 pounds for a maximum liability of $30,725.00. The two questions presented are thus what, if any, liability rate was agreed to by the parties and then what weight should be used to determine the actual maximum amount of liability.

### 1. Limitation on Liability

■ Defendant's ability to limit its liability to claims for damage to shipments in its possession is governed by 49 U.S.C. §§ 14706(a)(1) and 14706(c)(1)(A).[3] *See Me-*

---

**3.** The substance of these provisions was previously found at 49 U.S.C. §§ 10730 and 11707 respectively. However, the law which has effect-

ed the change *see* ICC Termination Act of 1995, Pub.L. 104–88, 109 Stat. 847 (effective January 1, 1996), did not alter the substance of the provi-

*chanical Technology Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085, 1087 (2d Cir. 1985). Section 14706(a)(1) requires a motor carrier to issue a receipt or bill of lading for property it receives for transport. *Toledo Ticket Co.*, 133 F.3d at 441. The carrier is then by default liable to the party entitled to recover under the receipt or bill of lading for any "actual loss or injury to the property," unless the carrier has limited its liability pursuant to 49 U.S.C. § 14706(c)(1)(A). *Toledo Ticket Co., id.*

> [U]nder [§ 14706(c)(1)(A),] if a carrier desires to limit its liability it must file one or more tariffs that set forth terms and conditions of shipment, freight rates available, and information relevant to shipping, including limitation of liability. Central to the scheme of limitation of liability is the requirement that each rate listed in the tariffs specify a "released rate," which is the maximum dollar liability per unit of weight for which the carrier will be liable.

*Rohner Gehrig Co., Inc. v. Tri-State Motor Transit*, 950 F.2d 1079, 1082 (5th Cir.1992).

■ Section 14706(c)(1)(A) provides that a shipper may, by "written or electronic declaration of the shipper" or "written agreement between the carrier and the shipper" agree to limit the carrier's liability in return for a lower freight rate. 49 U.S.C. § 14706(c)(1)(A); *see Mechanical Technology Inc.*, 776 F.2d at 1087. However, the shipper is not required to accept the lower shipping rate and share the risk of loss; instead, it can select a higher shipping rate thus placing the risk of loss on the carrier. *Toledo Ticket Co.*, 133 F.3d at 441–42. Section 14706(c)(1)(A) is thus a very narrow exception to the general rule of complete liability for actual loss. *Id.* at 442; *Rohner Gehrig Co., Inc.*, 950 F.2d at 1083 ("When it adopted [what is now 14706(c)(1)(A) ] eighty-five years ago, Congress expressed a public policy against limitation of liability by carriers. The absolute prohibition of limitation was softened ever so slightly when Congress

adopted [the provision], admitting a narrow exception to that public policy.")

■ For a carrier to limit its liability pursuant to § 14706(c)(1)(A), it must satisfy four requirements: it must (1) maintain approved tariff rates with the Surface Transportation Board ("STB")[4]; (2) give the shipper a fair opportunity to choose between two or more levels of liability; (3) obtain the shipper's written agreement as to his choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Id.* The burden of establishing that an agreement limiting liability has been made rests with the carrier. *Acro Automation Systems Inc. v. Iscont Shipping Ltd.*, 706 F.Supp. 413, 416 (D.Md.1989). Plaintiff does not present any argument with regard to the second and fourth requirements. The Court therefore considers whether the first and third are satisfied.

### a. ICC-approved Tariff

Plaintiff argues that defendant's tariff was not filed at the time when the cargo was being shipped. However, defendant has submitted a copy of its tariff which was effective as of January 1, 1995. *See* Jones Reply Aff.Exh. 2. The equipment at issue here was picked up on February 7, 1996 and delivered on February 14, 1996. Defendant's tariff was therefore properly filed and effective at the time of the shipment.

### b. Was there effective written agreement to the 10 cents/pound rate?

■ Defendant argues that although IBM wrote down a released rate of $5.00/pound on the bill of lading, the Court should impose a rate of 10 cents/pound. Based on the cases it cites, defendant apparently relies on the doctrine of constructive acceptance, where a shipper may under certain circumstances be found to have accepted a released rate even

sions in a way that is relevant here. *Praxair Inc. v. Mayflower Transit, Inc.*, 919 F.Supp. 650, 652 n. 2 (S.D.N.Y.1996); *but see* 49 U.S.C. § 14706(c)(1)(A) (excepting household goods from general procedure of liability limitation).

4. Formerly, tariff approval was the responsibility of the Interstate Commerce Commission. That body has been dissolved and its duties moved to the STB. *See* ICC Termination Act of 1995, Pub.L. 104–88, 109 Stat. 847 (effective January 1, 1996).

where it has not expressly stated so in a written agreement.

The doctrine of constructive acceptance was most recently applied by the Second Circuit in *Mechanical Technology Inc., supra.* In that case, the court held that because " 'shippers are charged with notice of terms, conditions, and regulations contained in the tariff schedule,' " *id.,* 776 F.2d at 1087 (quoted case not cited in opinion), a shipper can be held to have constructive knowledge of and assent to the terms of a tariff where the shipping contract " 'was negotiated between people of at least equal economic stature and commercial awareness or acuity.' " 776 F.2d at 1088 (quoting *Ruston Gas Turbines, Inc. v. Pan American World Airways,* 757 F.2d 29, 32–33 (2d Cir.1985)). Thus, if a tariff contained an "inadvertence clause" specifying that a particular released rate would operate when no other rate was requested by the shipper, a shipper who failed to request a rate may be held to have implicitly accepted the default rate. *Id.* at 1089.

Other circuits have been reluctant to accept this doctrine. *See Toledo Ticket Co.,* 133 F.3d at 443 (failure to specify released value does not give carrier option of choosing lowest released value on tariff); *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 108 (1st Cir.1978) ("a carrier cannot limit liability by implication"); *see also Rohner Gehrig Co., Inc.,* 950 F.2d at 1082–85 (no limitation of liability unless terms of tariff are substantially supplied in the carrier's bill of lading). Therefore, although Second Circuit precedent is undeniably applicable in this case, the Court is reluctant to extend the doctrine affirmed in *Mechanical Technology Inc.* beyond its established boundaries.

Critically, *Mechanical Technology Inc.* did not abrogate the requirement that the shipper agree to the limitation of liability. *See id.,* 776 F.2d at 1088. It merely found that such agreement could be presumed where: (1) the carrier's lawfully filed tariff contained an applicable inadvertence clause, (2) the circumstances justify holding the shipper to have been constructively aware of the terms of the tariff or actually aware of those terms, (3) a space was provided on the bill of lading to request a released rate other than the default rate in the inadvertence clause, and (4) the shipper "[left] *blank* the space provided for declaring the released value of the goods...." 776 F.2d at 1089 (emphasis added). *Id.* at 1087–88. *See also Ruston Gas Turbines, Inc. v. Pan American World Airways,* 757 F.2d 29 (2d Cir.1985) (shipper bound by liability limitation where it had actual knowledge of the terms of the tariff). *Compare U.S. JVC Corp. v. New England Motor Freight, Inc.,* No. 89 CIV. 3039, 1990 WL 115621, *2 (S.D.N.Y. Aug. 7, 1990) (whether shipper agreed to default liability rate was question of fact where shipper's bill of lading form did not provide a space for shipper to specify rate other than the default rate).[5]

■ Unfortunately for the defendant, IBM did not leave the relevant portion of the bill of lading blank. Instead, next to the language, "THE AGREED OR DECLARED VALUE OF THE PROPERTY IS HEREBY SPECIFICALLY STATED BY THE SHIPPER TO BE NOT EXCEEDING", IBM put down "$5 Per Lb." Jones. Aff.Exh. A. Thus, it was not silent on the issue of limitation of liability. To hold that IBM constructively assented to the 10 cents/pound rate, the Court would have to conclude that it constructively agreed to terms in contradiction to the terms it expressly stated on the bill of lading. Applying the rate specified in the inadvertence clause would require an extension far beyond the holding of *Mechanical Technology Inc.* The Court declines to further erode the requirement of actual agreement in this fashion.

Defendant asserts, without dispute, that IBM chose the $5.00/pound from a tariff schedule for new electronic equipment and argues that because the actual goods are

---

**5.** Of course, if the bill of lading language specifically describes the effect of the inadvertence clause, the Court would not have to find constructive knowledge since the shipper is always held to have knowledge of terms specifically stated in the bill of lading. *See Johnson v. Bekins Van Lines Co.,* 808 F.Supp. 545, 549 (E.D.Tex.1992), *aff'd,* 995 F.2d 221, *cert. denied.,* 510 U.S. 977, 114 S.Ct. 471, 126 L.Ed.2d 422 (1993) (shipper who accepted bill of lading without reading it nevertheless bound to limitation specifically stated therein).

used machines, with a different tariff schedule, the rate chosen by IBM is inapplicable to the shipment at issue. Defendant argues implicitly that if IBM's specified rate is inapplicable, IBM cannot be found to have specified any rate and that the inadvertence clause for used goods should therefore be applied. However, this argument is not persuasive. Regardless of whether the $5.00/pound rate is inapplicable, IBM's choice of this rate is sufficient to indicate that it does not agree, expressly or by implication, to any other limit on its liability and without such agreement, no limitation is effective. *Mechanical Technology Inc.*, 776 F.2d at 1088. Thus, whether or not the $5.00/pound rate is applicable, defendant has failed as a matter of law to demonstrate that it has effectively limited its liability to 10 cents/pound.

*c. Was there effective agreement to the $5.00/pound rate?*

■ The Court finds that the $5.00/pound rate expressly agreed to by IBM was effective as a limitation on defendant's liability. A contractually agreed-upon released rate is void only if the contractual rate is in conflict with the applicable terms of the carrier's tariff. *See Hughes Aircraft Co. v. North American Van Lines*, 970 F.2d 609, 613 (9th Cir.1992). *See also Square D Company v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 416–417, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) ("The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. . . . The rights as defined by tariff cannot be varied or enlarged by either contract or tort of the carrier." (citation and internal quotations omitted)). Thus, if the $5.00/pound rate were contradicted by the applicable tariff terms, e.g. if the tariff specified a maximum level of liability for used computers of $2.00/pound, the contract terms would be superseded and the tariff terms would control. *See Hughes Aircraft Co.*, 970 F.2d at 612–13 (where tariff

established a maximum liability of $.60/pound, this provision prevailed over conflicting indemnity clause in contract). The enforceability of the $5.00/pound released rate depends on what tariff terms are applicable and on whether the agreed rate is in conflict with those terms.

■ Defendant asserts that the applicable tariff terms are those in Item 848, which uses the heading "Used Machinery or Parts; Used Electrical Equipment Group; and Used Agricultural Implement or Parts." Jones Reply Aff. ¶ 7, Exh. 2. This section states that "[f]ailure of the consignor to declare that the commodity is 'used' shall not alter the application of [Item 848.]" *Id.* It is undisputed that plaintiff's shipment was of used machines. Magliato Aff. ¶ 5. Therefore, Item 848 applies.

However, there does not appear to be any conflict between the tariff terms and the $5/pound rate. Item 848 does not state that a shipper may not request a $5.00/pound rate. It only states that "[w]hen a consignor declares actual value exceeding 250 cents per pound on shipment," the carrier will apply "110% of applicable class rate(s) or minimum charge." Jones Reply Aff.Exh. 2.[6] The Court therefore finds that the $5.00/pound rate requested and paid for by IBM is effective as a matter of law. The weight of the shipment must now be determined to fix the absolute amount of defendant's liability limitation.

*2. The Weight of the Shipment*

■ The parties dispute the actual weight of the cargo. Defendant points to the delivery receipt, Magliato Aff.Exh. B, and an "MTI inspection report," Jones Reply Aff. Exh 1. The former document indicates that the weight is 2,400 pounds. An "MTI inspection report," prepared on February 29, 1996 by a third-party after plaintiff received the shipment and discovered the alleged damage,

---

**6.** For further discussion of the effect of a shipper's misdescription of goods on a carrier's liability, *see Mass v. Braswell Motor Freight Lines, Inc.*, 577 F.2d 665 (9th Cir.1978) (carrier's liability subject to common law rule that shipper who intentionally fails to disclose the high value of his shipment in order to get a lower freight rate is barred by his misconduct from recovery for a loss the carrier did not anticipate.); *Semi Metals, Inc. v. Pinter Brothers*, 135 N.J.Super. 464, 343 A.2d 757, 761 (N.J.Super.Ct.App.Div.1975), *aff'd*, 70 N.J. 437, 360 A.2d 385 (N.J.1976) (comparing effect of innocent versus intentional misdescription); *see also* Annotation, "Shipper's misdescription of goods as affecting carrier's liability for loss or damage," 1 A.L.R.3rd 736 (1965).

quotes the weight as 2,400 pounds. The inspector apparently relied on the information stated in the receipt. *See* Magliato Aff. Exh. B (on report form next to the words "Bill Description," inspectors entered weight of 2,400 pounds). The report also states that the plaintiff

> advised that the weight on the freight bill is incorrect and appears to have been estimated. A correct weight will be submitted as compiled by manufacturers shipping weights.

Magliato Aff.Exh. B. Plaintiff submits a letter from Magliato listing what is claimed to be an actual inventory of the goods and the manufacturer's specifications of what the shipping weights are. Magliato Aff. Attached Exh. From this information, plaintiff claims that the actual weight was 6,145 pounds.

■ Where a shipper, in forming a contract to carry goods, has held out the goods as being of a certain weight, the stated weight is applicable in determining the limit of the carrier's liability even if the stated weight differs from the actual weight. *See Carmana Designs v. North American Van Lines*, 943 F.2d 316, 320–21 (3d Cir.1991) (limitation of liability would be based on stated weight of 24,000 pounds regardless of actual weight where there was no evidence that shipper intended liability limitation to apply to actual weight). Here, IBM agreed to and paid a freight charge for a shipment of 2,400 pounds and thus accepted the weight as a limitation of the defendant's liability. *See* Magliato Aff. ¶ 9 & Attached Exh. Thus defendant's liability is limited as a matter of law to $12,000.00.

Accordingly, it is hereby

ORDERED that this Order supercedes the Order of the Court filed on June 30, 1998; and it is further

ORDERED that defendant's motion for partial summary judgment is GRANTED in part and DENIED in part, and its liability in this action is limited to the amount of $12,-000.00; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.