[Civ. No. 49877. Second Dist., Div. Five. Sept. 23, 1977.]

INFORMATION CONTROL CORPORATION,
Plaintiff and Respondent, v.
UNITED AIRLINES CORPORATION, Defendant and Appellant.

## COUNSEL

Cummins, White & Breidenbach, Steve J. Ruben and Gregory D. Bistline for Plaintiff and Respondent.

Dunne, Shallcross & Kane and Mark C. Kane for Defendant and Appellant.

## OPINION

IBÁÑEZ, J.,*—Plaintiff-respondent, Information Control Corporation (Info), recovered judgment against United Airlines Corporation (United), in a court trial. Info, the shipper, delivered merchandise to United, carrier, for shipment and the merchandise was lost in transit.

The contention of United here, and in the court below, is that under the provisions of the Federal Aviation Act of 1958 its liability for loss of merchandise in transit is limited to 50 cents per pound, amounting here to a total of $150. The judgment for Info was for $47,000 based upon the value of the merchandise lost in transit.

The trial court found that United willfully breached the agreed routing of the merchandise which was to be on a direct flight having its origin in Los Angeles and its terminal in Detroit; instead, there was a rerouting or deviation, namely, from Los Angeles to Chicago, overnight in a warehouse in Chicago, then from Chicago to Detroit. This rerouting or deviation was without the knowledge or consent of Info, the shipper.

The court below concluded that the deviation from the agreed route by the stopover in Chicago increased the risk of the loss, was without good cause and was made without the knowledge or consent of Info. This willful breach deprived United of the liability-limit protection under the Federal Aviation Act of 1958.

We agree with the trial court and affirm the judgment.

## THE FACTS

Info is engaged in the manufacture and sale of computers and computer components. One of its computers [Cor Pac 40, Mark I 64K] was lost in transit. Hereinafter it will be referred to as the computer.

It was the practice and the policy of Info to airfreight all computer and computer parts on direct (nonstop) flights. This practice and policy was based upon Info's experience which showed that most losses occurred during loading, unloading, or warehousing operations. This was the practice and policy which prevailed on the date of the loss.

---

*Assigned by the Chairperson of the Judicial Council.

On July 26, 1972, Mr. Lewis Goldstick, traffic manager for Info, prepared two items for shipment by airfreight; one was the computer weighing 300 pounds; the other, spare parts for the computer weighing 65 pounds. The two items were separately boxed.

After boxing the merchandise Mr. Goldstick studied the airline schedules and concluded that United's flight 80 leaving Los Angeles the next morning (July 27, 1972) was the best direct flight from Los Angeles to Detroit. Mr. Goldstick then telephoned United and confirmed space on this flight. He prepared a document known as a "Uniform Airbill" (being #016 LAX 57121831), hereinafter referred to as the airbill.

At approximately 5 o'clock p.m. on July 26, 1972, Mr. Goldstick personally delivered the two boxed items and the airbill to a dispatcher at the United freight terminal in Los Angeles who, after confirming the reservation on United's flight 80 for the following day, wrote in the appropriate space on the airbill the numbers "80/26."[1]

On the airbill the following language appeared, "Airline routing applies unless customer routing specifically inserted." The airbill was stamped at United at 5:03 p.m., July 26, 1972. This indicated the exact time when the two items were received for shipment.

That evening there was further confirmation. Mr. Goldstick spoke to Ralph Wenstrom who, at that time, was staff assistant to United's cargo manager. At the time of the trial, he was air freight supervisor for United. Mr. Wenstrom reassured Mr. Goldstick that the computer would be shipped on flight 80 on July 27, 1972. It was important to Info that the merchandise arrive on schedule because its engineers had been sent to Detroit to meet the shipment and to install the computer.

As noted, the merchandise was received for shipment by United at approximately 5 p.m. on July 26, 1972. This was in time for shipment on flight 80 departing at approximately 9 a.m. the following day. Despite the fact that there was a reservation for Info on flight 80 and despite the fact that the computer and parts could have been shipped on this flight,

[1]The designation flight "80/26" is a shorthand notation that the shipment should be sent on flight 80 on July 26, 1972. Actually, flight 80 had already departed at 9 a.m. on that day. The court made a specific finding, supported by the evidence, that it was understood that what was intended was flight 80 on July 27, 1972, as this was the flight on which the reservation was confirmed.

according to freight supervisor Mr. Ralph Wenstrom, United failed to make the shipment. Instead, United rerouted the shipment. No reason for the rerouting was given.

Mr. Wenstrom testified that it was a policy of United to inform airfreight customers who request a particular flight when such a flight is not available. Here, United did not inform Info that the flight selected by it was not available; nor was Info informed that the route would be changed from a direct (nonstop) flight to a stopover flight.

On July 27, 1972, the scheduled departure day, the computer and parts were not shipped on flight 80. Instead, United rerouted the merchandise on flight 100 leaving Los Angeles at 8:30 a.m., arriving at O'Hare in Chicago at 1:51 p.m., with an overnight warehousing stopover at O'Hare, then a second departure the following day on flight 990 leaving Chicago at approximately 7 a.m. and arriving in Detroit one hour later.

The airbill was changed en route. The weight of the shipment appearing thereon was changed from 365 pounds to 65 pounds. Mr. Wenstrom of United was asked to explain the change. He replied that "there is a possibility," "just a guess on my part" that the "two pieces became separated, and when the agent in Chicago, or some other station picked it up," he noted that it did not weigh 365 pounds so he changed the weight "not knowing that there was another part to it." United's flight 990 arrived at Detroit on July 28, 1972, but only the computer parts arrived, not the computer.

The trial court made specific findings. It found that the airbill allowed the shipper to specify the routing; that Info specified that the computer and parts were to be shipped nonstop on flight 80; that both parties understood that the shipment was to be made on flight 80 departing Los Angeles on July 27, 1972, and that United could have shipped the computer and parts on that flight if it had desired to do so. Since it failed to do so, it was necessary to store the computer over night in a warehouse in Chicago. This deviation, without the consent of Info, increased the risk of loss or damage to the computer.

From the foregoing findings the court concluded that the route deviation was a material breach of the agreement for shipment between Info and United; that United's failure to ship the computer on flight 80 was willful, entitling Info to rescind the agreement and recover its damages.

## DISCUSSION

The threshold question is whether United can limit its liability under the provisions of the Federal Aviation Act of 1958 to $150 for a loss suffered by Info, its shipper, amounting to $47,000.

### Filing of Tariffs Showing Rates

Section 1373(a) of the Federal Aviation Act of 1958 (Aviation Act) (49 U.S.C.A. § 1373(a)), requires every air carrier to file with the Civil Aeronautics Board, print and keep open to public inspection, tariffs showing all rates, fares and charges for air transportation, and showing to the extent required by regulations of the board, all classifications, rules, regulations, practices and services in connection with such transportation.

The requirement that tariffs be filed with Civil Aeronautics Board (CAB), and kept open to public inspection is one of the means adopted to prevent public carriers from giving preferential rates to shippers.[2] Under section 204 of the Aviation Act (49 U.S.C.A. § 1324), the board is empowered to make rules and regulations to carry out the provisions of the act. Pertinent here are its regulations found in subchapter A entitled "Economic Regulations" and part 221 thereof entitled "Construction, Publication, Filing and Posting of Tariffs."[3] (14 C.F.R. § 200 et seq. (1977).)

---

[2]Sections 403 and 404 of the Aviation Act [49 U.S.C.A. §§ 1373, 1374], provide in pertinent part, as follows:

"403(a). Every air carrier . . . shall file with the Board . . . . tariffs showing all rates, fares, and charges for air transportation between points served by it . . . ."

"(b)(1). No air carrier . . . shall charge . . . a greater or less or different compensation for air transportation . . . than the rates, fares, and charges specified in then currently effective tariffs . . . ."

"(2) No shipper . . . shall knowingly pay . . . any greater or less or different compensation for air transportation . . . than the rate, fares, and charges specified in currently effective tariffs applicable to such air transportation; . . . ." (49 U.S.C.A. § 1373.)

"404(a)(1). It shall be the duty of every air carrier . . . to establish . . . just and reasonable . . . rates, fares and charges . . . ."

"(b) No air carrier . . . shall make, give, . . . any . . . unreasonable preference . . . to any particular person . . . or subject any particular person . . . to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." (49 U.S.C.A. § 1374.)

[3]"§ 221.38 Rules and Regulations.

"(a) *Contents.* Except as otherwise provided in this part, the rules and regulations of each tariff shall contain:

"(1) Such explanatory statements regarding the fares, rates, rules or other provisions

*Exculpatory Provisions in Tariff Rules*

Where the potential liability of a carrier to the shipper for loss of merchandise in transit is a factor in determining the rates charged by the carrier, the regulations require that the "provisions and charges which in any way increase or decrease the amount to be paid on any shipment" be filed. (14 CFR § 221.38(a)(4) (1977).)

On the date of the loss of the computer the tariff rules of United were on file with CAB. These included a "limitation of liability" or exculpatory[4] rule. It provided that the total liability of United could not exceed the value of the shipment as determined under rule 52 or the actual value of the shipment, or the amount of any damage actually sustained, whichever was least. Rule 52 indicated that the shipment should have a declared value of $0.50 per pound, (not less than $50), unless a higher value was declared in the airbill at the time of receipt of the shipment from the shipper, and if a higher value was so declared, an additional transportation charge of $0.10 was required for each $100 (or fraction thereof) by which such higher value exceed $0.50 per pound or $50 whichever was higher.

Admittedly, Info did not declare a higher value at the time it delivered the shipment to United; it is also admitted that the "limitation of liability" rule was on file on the date of the loss and that the loss of the computer occurred as described.

---

contained in the tariff as may be necessary to remove all doubt as to their application.

"(2) All of the terms, conditions, or other provisions which affect the rates, fares or charges for air transportation named in the tariff.

"(3) All of the rates or charges for and the provisions governing terminal services and all other services which the carrier undertakes or holds out to perform on, for, or in connection with air transportation.

"(4) All other provisions and charges which in any way increase or decrease the amount to be paid on any shipment or by any passenger or by any charterer or which in any way increase or decrease the value of the services rendered to the shipment or passenger or charterer." (14 C.F.R. § 221.38 (1977).)

[4]Rule 32 (A)(3) LIMIT OF LIABILITY

". . . the total liability of the carrier shall in no event exceed—(a) The value of the shipment as determined pursuant to Rule 52, or (b) The actual value of the shipment, or (c) The amount of damages actually sustained, whichever is the least."

Rule 52 (A)(1) CHARGES FOR DECLARED VALUE

". . . A shipment shall have a declared value of $0.50 per pound (but not less than $50.00) unless a higher value is declared on the airbill at the time of receipt of the shipment from the shipper, and if a higher value is so declared, an additional transportation charge of $0.10 shall be required for each $100.00 (or fraction thereof) by which such higher value exceeds $0.50 per pound or $50.00, whichever is higher."

*Purpose and Statutory Scheme*

Both the Aviation Act and the Interstate Commerce Commission Act were enacted to eliminate and to prevent preferential treatment of shippers by public carriers.[5]

Sections 403 and 404, footnote 2, *supra,* "were intended to protect the traveling public and were designed to effectuate the 'rule of equality' in the air transportation industry." (*Transcontinental Bus System, Inc.* v. *C. A. B.,* 383 F.2d 466, at p. 475.)

"The Act is intended to be a comprehensive scheme for regulating interstate air travel in this country. The Act declares that one of its aims is to 'foster sound economic conditions in . . . [interstate air transportation] and to improve relations between, and coordinate transportation by, air carriers.' " (*Berkman* v. *Trans World Airlines, Inc.* (S.D.N.Y. 1962) 209 F.Supp. 851, 853.)

*Exculpatory Rules and Rates*

The exculpatory rules and rates and charges in the tariffs on file with CAB are interrelated. As has been stated, if no declaration of value is made by the shipper the liability of the carrier for shipment loss is limited to actual value or 50 cents per pound, whichever is less. On the other hand, if the shipper does declare a value the charges to the shipper increase according to a graduated scale based on values. (Fn. 3, *supra.*)

Are these exculpatory rules so intertwined with the regulation of rates and charges that not to apply them to the facts before us will disrupt the statutory scheme and pervert the purposes of the Aviation Act?

*Interstate Commerce Commission Act and Aviation Act*

The purpose of the Interstate Commerce Commission Act (ICCA) and the Aviation Act is the same as they relate to enforcing the "rule of equality" and preventing abuses based upon discriminatory treatment of

---

[5]"The granting of preferential and discriminatory rates in an indiscriminate manner was one of the abuses, among others, which gave rise to the passage of the Interstate Commerce Commission Act [citations omitted], and both that Act and the Civil Aeronautics Act of 1938, as re-enacted in the Federal Aviation Act of 1958, were enacted to halt those abuses." (*Transcontinental Bus System, Inc.* v. *C. A. B., supra,* at p. 475.)

shippers by public carriers; hence, related decisions interpreting exculpatory rules found in ICCA are germane in interpreting exculpatory rules under the Aviation Act.

*Boston & Maine R. Co.* v. *Hooker* (1914) 233 U.S. 97 [58 L.Ed. 868, 34 S.Ct. 526] held that the tariff, which included the exculpatory rules, published by the rail carrier limited its liability for the loss of passenger baggage. The passenger was deemed to have constructive notice of the published tariffs which provided that the passenger could increase his protection from baggage loss by paying an increased rate based upon the declared value. Amendments to the ICCA, especially the so-called Carmack Amendment,[6] codified the rule of *Hooker.*

## THE AVIATION ACT AND
## THE EXCULPATORY RULES

The Aviation Act does not have a provision, comparable in language, to the "Carmack Amendment" in the ICCA. Based on this fact it has been held that it was the intention of the Congress not to restrict the power of a public carrier by air to limit its liability to the shipper as it is restricted in *Hooker* and by the Carmack Amendment. (*Lichten* v. *Eastern Airlines, Inc.* (2d Cir. 1951) 189 F.2d 939 [25 A.L.R.2d 1337].)[7]

*Lichten, supra,* involved an "over-carriage" baggage loss by an air passenger. The passenger was travelling from Miami to Philadelphia. He

---

[6]"Any common carrier . . . receiving property for transportation from a point in one State . . . to a point in another State . . . shall be liable . . . for any loss, damage, . . . to such property caused by it . . . the provisions hereof respecting liability for full actual loss . . . notwithstanding any limitation of liability . . . shall not apply . . . to property . . . concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released. . . ." (49 U.S.C.A. § 20 (11).)

[7]"In its purpose, as in its general statutory provisions, the Civil Aeronautics Act is similar to the Interstate Commerce Act. [Citations omitted.] The latter, however, contains an express provision prohibiting exemption from liability for any loss or damage to baggage caused by the carrier, regardless of negligence, but permitting reasonable valuation agreements to limit that liability. [Citations omitted.] The absence of similar provision in the Civil Aeronautics Act compels the conclusion that such an exemption is not forbidden to air carriers, and that the Board could properly accept the appellee's tariff." (*Lichten* v. *Eastern Airlines, supra,* 189 F.2d 939, 941.)

boarded, with baggage, on a flight originating in Miami and terminating in Jersey City. There was a stopover in Philadelphia where Lichten, the passenger, deplaned. His baggage, with valuable jewelry, remained on the continuation flight to Jersey City. Lichten's baggage and jewelry were lost as a result of the carrier's negligence and he brought an action for damages against the carrier.

The tariff rules on file by the carrier with the board totally exonerated it for this loss. Basing its decision thereon, judgment in favor of the carrier was entered by the trial court. The judgment was affirmed on appeal.

There is a dissent stating that a tariff which totally exonerates a carrier from liability is void. "Since there is nothing in the Civil Aeronautics Act at all comparable to the Carmack Amendment, I think the Civil Aeronautics Board is without power to legalize such a provision here." (*Lichten, supra,* at p. 944.)

In the absence of a Carmack Amendment in the Aviation Act, points out the dissent, the New York rule which invalidates a provision making a public carrier immune from liability would apply under *Erie R. Co.* v. *Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817, 114 A.L.R. 1447]. If, on the other hand, Congress, in enacting the Aviation Act intended that uniform rules should govern interstate air carriage then "it is inconceivable that Congress intended, merely by remaining silent, to authorize the Board to adopt a policy flatly at odds with the hitherto uniform Federal policy, frequently announced by the Supreme Court in decisions involving all sorts of transportation, . . . I do not see why the reasons for that rule—i.e., the encouragement of care on the part of carriers, and the protection of shippers and passengers from imposition by the carriers—do not apply with equal force to transportation by air. I would suppose that for those reasons, if Congress intended that uniform rules should govern interstate air commerce, Congress intended that the hitherto federal rule as to liability should govern here." (*Lichten, supra,* at pp. 944, 945.)

*Philco Corporation* v. *Flying Tiger Line, Inc.* (1969) 18 Mich.App. 206 [171 N.W.2d 16] decided 18 years after *Lichten,* which it cites and distinguishes, presents issues strikingly similar to those before us. The shipper and plaintiff purchased sophisticated electronic equipment in California including extremely delicate "memory cores" valued at approximately $140,000. Careful handling of this equipment was

required; this included keeping the memory cores in an upright position at all times otherwise damage would result. The shipper, Philco, delivered the memory cores to The Flying Tiger Line for air shipment from Culver City, California, to Willow Grove, Pennsylvania. The carrier was informed of the care essential in handling the shipment; and of the fact that the memory cores must remain in an upright position at all times requiring the use of aircraft with doors of sufficient height to permit their loading and unloading in an upright position. The carrier assured Philco that only "swing-tailed" aircraft would be used which had loading entrances of adequate height for this purpose.

The memory cores arrived at Willow Grove, Pennsylvania, not in an upright position, but horizontally, and in a seriously damaged condition. The memory cores were not transported in aircraft with "swing-tailed" facilities.

The carrier had on file a tariff reading as follows: "A shipment shall be deemed to have a declared value of 50 cents per pound (but not less than $50.00) unless a higher value is declared on the Air Bill at the time of the receipt of the shipment from the shipper."

In an action by the shipper against the carrier the trial court, by partial judgment, awarded damages to the shipper but limited the amount to the tariff on file by the carrier. On appeal, the judgment was reversed with instructions that the court determine as a question of fact whether there was a material and unjustified deviation by the carrier. "If it is thusly found, then the contract should be rescinded."

While the opinion in *Philco* ranges far afield, its holding is easily summarized: (1) The savings clause of the Federal Aviation Act recognizes the availability of state remedies not inconsistent with the purpose of the act.[8] (See *Southeastern Aviation, Inc.* v. *Hurd* (1962) 209 Tenn. 639 [355 S.W.2d 436] app. dism. 371 U.S. 21 [9 L.Ed.2d 96, 83 S.Ct. 120].) (2) *Mitchell* v. *Union Pacific Railroad Co.* (S.D.Cal. 1960) 188 F.Supp. 869, held that it was not against the legislative policy against rebates and in favor of uniform rates to deprive a public carrier of the defense of the exculpatory rules where the contract of carriage is procured by fraud. (*Mitchell* v. *Union Pacific Railroad Co.* (1960) *supra,*

---

[8]"§ 1506. *Remedies not exclusive*

"Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." (49 U.S.C.A. § 1506.)

at p. 874.)[9] (3) Where there is a deviation from the performance contracted for so great "as to completely change the risk and terms of the contract, the shipper should not be bound by the contract, that is, the contract should be rescinded." (*Id.,* p. 24.) (4) The carrier's contention that "the limitation of liability is absolute, regardless of a fundamental breach which goes to the very essence of its undertaking, would permit any carrier to violate with recklessness the terms of the bill of lading, knowing it cannot be called upon to pay more than 50 cents per pound." (*Id.,* pp. 24-25.) (5) *Lichten* was distinguished on the ground that it involved ordinary negligence.

Neither *Philco* nor *Mitchell* has been overruled. Obviously there is a shadowy line between the type of "fundamental breach" which permits rescission coupled with reimbursement and the type of misconduct in the performance of the contract—whether labeled negligence or gross negligence—which restricts the shipper to the terms of the tariff. We are quite satisfied, however, that the facts of this case fit comfortably into the *Philco* rule.

The judgment is affirmed.

Kaus, P. J., and Hastings, J., concurred.

---

[9]". . . Logic impels the result that the value declaration and the tariff provisions are of no force and effect when a contract of carriage is secured by deceit such as found by the jury to exist here. . . . [T]he real question here is whether or not the legislative policy of maintaining uniform rates and of preventing rebates is so strong that it would allow the carrier to limit its liability even though it was the fraud of one of its agents which induced the contract of carriage. . . .[T]he court holds that the fraud vitiated the value declaration and the tariff provisions which would limit the liability." (*Mitchell* v. *Union Pacific Railroad Co., supra,* at p. 874.)