**PRAXAIR INC., Plaintiff,**

v.

**MAYFLOWER TRANSIT, INC., Defendant.**

**No. 95 Civ. 0258 (JGK).**

United States District Court, S.D. New York.

Jan. 26, 1996.

David L. Mazaroli, New York City, for Plaintiff.

Janet D. Cebula, Law Offices of Richard M. Gates, Garden City, New York, for Defendant.

### *OPINION*

KOELTL, District Judge: [1]

This action is brought by Praxair Inc. ("Praxair") to recover the cost of repairing damage to its equipment allegedly sustained during shipment by the defendant Mayflower Transit, Inc. ("Mayflower") in January 1994. Praxair asserts causes of action for both breach of contract and negligence against Mayflower for damages in excess of $182,000. Mayflower now moves for partial summary judgment with respect to the amount of damages, arguing that the liability limitation provided on the bill of lading and the applicable ICC tariff limits its damages to $11,434.00.

### I.

■ Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions

1. This opinion was delivered from the bench on January 26, 1996.

on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.,* 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers*

*v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

## II.

Mayflower argues that its liability is limited by the provisions of both the applicable tariff and the bill of lading. Mayflower maintains that this liability limitation is valid and enforceable under the Carmack Amendment to the Interstate Commerce Act. In response, Praxair argues first that Mayflower committed gross negligence in shipping the equipment at issue and therefore should not be permitted to assert the liability limitation. Praxair relies on the "material deviation" doctrine from admiralty case law to support this argument. Alternatively, Praxair argues that a genuine issue of material fact exists with respect to whether the $5.00 per pound "released rate" governed this particular shipment because the space provided on the bill of lading for a higher declared value was left blank and a notation appears that refers to $5.00 per pound as "Insurance." I will discuss the validity of the liability limitation in the first instance.

## A.

Mayflower is correct that the applicable statute governing the liability of common trucking carriers is the Carmack Amendment, which provides, in relevant part:

[A] motor common carrier ... may ... establish rates for the transportation of property ... under which liability of the carrier or freight forwarder for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier or freight forwarder and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 10730(b)(1).[2] *See* 49 U.S.C. § 11707(c)(4) (permitting common carriers to limit liability pursuant to § 10730). In this case, the bill of lading provides that "[u]nless a different value is declared, the Shipper hereby releases the property to a value of

**2.** I note while the Interstate Commerce Act was amended in December 1995 to abolish the Interstate Commerce Commission, *see* ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat.

803, this amendment did not change any of the provisions of the Carmack Amendment that are germane to this action.

$5.00 per pound per article." (*See* Affirmation of Janet D. Cebula, executed Oct. 19, 1995, Ex. B.) No different declared value appears in the space provided. Moreover, the bill of lading indicates that the cargo is "tabulating equipment," a type of cargo classified under Item 100, Part B of the applicable tariff, Tariff No. 300–B. (*See* Cebula Aff., Ex. E.) Based on that classification, the transportation rates for the shipment were derived from section five of the tariff which provides that such rates are applicable to shipments released to values not exceeding $5.00 per pound per article. (*See id.*)

None of the foregoing is disputed by Praxair. In fact, Praxair's purchasing agent for transportation, Norbert Hinze, testified at his deposition that he believed the reference on the bill of lading to "Insurance $5.00 per pound" referred to the $5.00 per pound per article liability limitation derived from the tariff. (*See* Cebula Aff., Ex. F.) Praxair offers no evidence to contradict Hinze's testimony.

Moreover, there is no dispute about the terms and conditions on the bill of lading. Those conditions include a released rate of either $5.00 per pound or $1.25 per pound depending on the classification of the cargo and absent a different declared value. The boxes for "Tabulating tariff valuation" and "Other than tabulating tariff valuation" make that plain. Spaces were provided for Praxair to indicate a higher declared value, and those spaces were left blank. Moreover, the tariff excerpts in the record, although incomplete, establish that a released rate of $5.00 per pound is applicable for Part B cargo and that a $1.25 per pound rate applies in the absence of a specific provision. Therefore, the released rate is either $5.00 or $1.25 per pound. For the purpose of this motion, however, there is no need to resolve that discrepancy, and the parties appear to agree that the released rate is $5.00 per pound. The bill of lading expressly identifies the cargo as tabulating equipment and cites Section 5 of the tariff which applies to Part B cargo—and Praxair does not dispute that classification. In any event, Mayflower concedes the higher $5.00 released rate is correct. Thus, even if there is a factual uncertainty with respect to which rate applies, for the purposes of this partial summary judgment motion, the parties have agreed that the $5.00 released rate may be presumed to be correct.

■ A bill of lading including a limitation of liability in the form of a released rate constitutes a written agreement between the parties under § 10730(b). Where the released rate appears on the bill of lading, or where the shipper is on constructive knowledge of the released rate provided in the tariff, the limitation on liability is enforceable. *See Mechanical Technology Inc. v. Ryder Truck Lines, Inc.,* 776 F.2d 1085, 1088–89 (2d Cir.1985); *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.,* 616 F.2d 619, 626 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980). In this case, the record consists of a bill of lading that classifies the cargo as tabulating equipment, recites a released rate of $5.00 per pound for such equipment, includes a space for a different declared value and explains that a released rate of $5.00 per pound per article applies if that space is left blank—and the space is blank.

■ Ordinarily, where an agreement limiting liability under the Carmack Amendment exists, as is the case here, liability is governed exclusively by that agreement, irrespective of the degree of negligence attributable to the carrier. *See Southeastern Express Co. v. Pastime Amusement Co.,* 299 U.S. 28, 29, 57 S.Ct. 73, 74, 81 L.Ed. 20 (1936); *American Cyanamid Co. v. New Penn Motor Express, Inc.,* 979 F.2d 310, 315–16 (3d Cir.1992); *Deiro v. American Airlines, Inc.,* 816 F.2d 1360, 1366 (9th Cir. 1987); *Rocky Ford Moving Vans, Inc. v. United States,* 501 F.2d 1369, 1372–73 (8th Cir.1974). *See also Cleveland v. Beltman North American Co., Inc.,* 30 F.3d 373 (2d Cir.1994). As one court put it:

> In the regime of released value rates, what governs the size of a recovery is not the degree of the carrier's negligence but rather the validity of the contract term for the released value. If a liability limitation is valid, recovery cannot exceed the released value no matter how negligent the carrier was. Most courts have found, for example, that a liability limitation is unaffected by a

breach of an essential term of the contract, gross negligence, or even willful conduct by the carrier's employees. It matters not, apparently, whether the goods were stolen, either while in transport or while being stored, even if an employee of the carrier stole them, indeed not even if an employee of the carrier deliberately set fire to them.

*Quasar Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 632 F.Supp. 1106, 1108–09 (N.D.Ill. 1986) (Moran, J.) (citations omitted).

■ Here, Praxair alleges that Mayflower was grossly negligent and materially breached its agreement to ship the APIMS equipment safely—specifically, Praxair points to missing rear wheels on the tractor trailer, a failure to blanket wrap the cargo as requested, placement of the cargo in the rear of the truck directly over the missing wheels, failure to secure the cargo, and an unauthorized stopover made by the driver. Praxair argues that Mayflower's actions constitute a material deviation from the shipping contract and make the liability limitation unenforceable.

Praxair's "material deviation" argument is derived from a doctrine in admiralty cases where a fundamental deviation from the shipping contract may make a liability limitation unenforceable. *See Pioneer Import Corp. v. The Lafcomo*, 159 F.2d 654 (2d Cir.), *cert. denied*, 331 U.S. 821, 67 S.Ct. 1310, 91 L.Ed. 1838 (1947); *The Sarnia*, 278 F. 459 (2d Cir.1921), *cert. denied*, 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797 (1922). Wholesale importation of that doctrine from admiralty to overland or airborne shipping has been rejected in this circuit. *See Lichten v. Eastern Airlines, Inc.*, 189 F.2d 939, 942 (2d Cir. 1951); *Rafaella Gallery, Inc. v. United Parcel Serv., Inc.*, 818 F.Supp. 53, 54 (S.D.N.Y. 1993). *See also Rocky Ford*, 501 F.2d at 1372; *American Cyanamid*, 979 F.2d at 315–16; *Barrett Moving & Storage Co. v. All States Air Cargo, Inc.*, 823 F.Supp. 498, 500 (N.D.Ill.1993). Praxair cites decisions from several state courts that have adopted the "material deviation" doctrine, *see, e.g., Cassidy v. Airborne Freight Corp.*, 565 P.2d 360, 362 (Okla.1977); *Johnson v. Bekins Moving & Storage Co.*, 86 Idaho 569, 577–81, 389 P.2d 109, 113–16 (1963); *Information Control Corp. v. United Airlines*, 73 Cal.App.3d 630, 640–41, 140 Cal.Rptr. 877, 884 (1977); *Philco Corp. v. Flying Tiger Line, Inc.*, 18 Mich. App. 206, 222–24, 171 N.W.2d 16, 24–25 (1969), and distinguishes the federal cases rejecting the doctrine as "factually distinguishable [and] not involving higher fees for specialized care." (Pl.'s Mem.Opp'n at 8 n. 1.) Praxair alleges that it paid Mayflower a higher transportation rate for specialized care, specifically air-ride and blanket wrapping, features designed to reduce the risk of damage to the APIMS equipment. Praxair argues that a breach of such "accessorial services" justify application of the material deviation doctrine.

In *Coughlin v. Trans World Airlines Inc.*, 847 F.2d 1432 (9th Cir.1988), a case relied on by Praxair and ignored by Mayflower, the Court of Appeals for the Ninth Circuit reversed the district court's order granting summary judgment on the issue of liability limitation under the tariff. The plaintiff sued the airline for the loss of her husband's cremated remains, alleging that the TWA ticket agent mistakenly told her she could not carry the funeral urn on the aircraft. The Court of Appeals held that a breach of the condition of the tariff that provided certain packages could be carried on board rather than checked as luggage for stowage in the cargo hold was material and justified rescission including the liability limitation. *See id.*, 847 F.2d at 1434. The Court noted that it was the breach of the tariff and not the ticket agent's negligence that voided the liability limitation. *See id.*, 847 F.2d at 1433.

In *Hill Construction Corp. v. American Airlines, Inc.*, 996 F.2d 1315 (1st Cir.1993) the Court of Appeals for the First Circuit rejected application of the material deviation doctrine in a case involving damage occurring during air transport. The opinion, written by then-Judge Breyer, distinguished *Coughlin*, explaining that "the Coughlin contract involved a separate, liability-limitation-related contractual promise, namely a promise that the passenger might personally monitor the safety of the valuables by carrying them in the cabin." *Hill*, 996 F.2d at 1319. The Court also rationalized state cases permitting the doctrine, explaining that "[i]n

each of the state cases, the carrier made a special, separate promise to the shipper about special conditions of carriage designed to lessen the risk of harm to the shipper's particular cargo." *Id.*, 996 F.2d at 1319. *See also Baloise Ins. Co. v. United Airlines,* 723 F.Supp. 195, 199 (S.D.N.Y.1989) (distinguishing *Information Control* on the same basis). The Court concluded that "as in Coughlin, the state courts saw fail~e to live up to these separate, risk-related promises (special to the particular shipment at issue) as a 'fundamental' departure from conditions precedent to the 'boilerplate' liability limitation's taking effect." *Hill,* 996 F.2d at 1319.

The reasoning of *Hill* is compelling. The cases where a material deviation from special shipment provisions designed to reduce risk to the cargo are similar to the circumstance in this case. For instance, in *Philco* the plaintiff specifically requested that its cargo, sophisticated electronic computer units, be transported upright to protect certain delicate components and that special swing-tailed aircraft be used to assure the cargo would be properly positioned. *See Philco,* 18 Mich.App. at 208, 171 N.W.2d at 17. The special aircraft were not used, the cargo was not shipped upright and the equipment was damaged. The court applied the material deviation doctrine, holding that "[w]here the deviation is so material under a contract as to completely change the risk and terms of the contract, the shipper should not be bound by the contract, that is, the contract should be rescinded." *Id.,* 18 Mich.App. at 223, 171 N.W.2d at 24. The court remanded for determination of whether the failure to ship the cargo upright constituted a material deviation. *Id.,* 18 Mich.App. at 224, 171 N.W.2d at 25. At the same time, the court affirmed summary judgment in the defendant's favor on the issue of whether the defendant's gross negligence rendered the tariff inapplicable. *Id.*

In *Information Control* the plaintiff requested that its computer be shipped on a non-stop flight based on its experience that most losses occur during loading, unloading, and warehousing operations. *See Information Control,* 73 Cal.App.3d at 632, 140 Cal. Rptr. at 878–79. Although the carrier assured the plaintiff the shipment was manifested on a non-stop flight, the shipment was rerouted to ~ flight with an overnight warehousing stopover. *See id.,* 73 Cal.App.3d at 634, 140 Cal.Rptr. at 879. Relying on *Philco,* the court affirmed the holding below that the liability limitation in the tariff was inapplicable because of the rerouting of the cargo on a stopover flight constituted a material breach of the shipment agreement. *See id.,* 73 Cal. App.3d at 639–41, 140 Cal.Rptr. at 883–84. *See also Johnson,* 86 Idaho at 581, 389 P.2d at 116 ("This special covenant—for the protective packaging of respondent's hi-fi set—which respondent specifically requested and appellant specifically agreed to perform upon receipt of an additional charge, is the precise ground upon which we affirm the decision of the trial court.")

Special safety measures arranged and paid for by the shipper are conspicuously absent from those cases rejecting use of the material deviation doctrine. In *Rafaella* there was no indication that the shipper had requested special treatment for its antique tapestries. *See Rafaella,* 818 F.Supp. at 53–54. In *Rocky Ford,* the court expressly noted the absence of any evidence the shipper had paid an additional charge for the privilege of approving the warehouse used to store its cargo. *See Rocky Ford,* 501 F.2d at 1372 n. 5 ("In this respect this case must be distinguished from those in which the court found a condition to be supported by independent consideration." (citing *Johnson* )). In *Barrett,* computer equipment was shipped by truck rather than by air, but the court noted numerous reasons for not finding a breach of the agreement, including the fact that the airbill permitted the carrier to make the shipment other than by air. *See Barrett,* 823 F.Supp. at 500–01. In *Cantor v. Piedmont Aviation, Inc.,* 474 A.2d 839 (D.C.1984), a passenger sued for lost luggage asserting the material deviation doctrine. The court rejected the doctrine, distinguishing *Information Control* and *Philco* as cases where the carrier departed from an expressly bargained for contract term relating to increased risk. *Cantor,* 474 A.2d at 841 n. 6. *See also Deiro,* 816 F.2d at 1363 (no special requests mentioned); *Conoco, Inc. v. Andrews Van Lines,* 526 F.Supp. 720, 721–22 (W.D.Okl.1981) (same).

On review, and when organized in accordance with Justice Breyer's observations in

*Hill,* the case law establishes that in cases of shipment by air, rail, and truck where the shipper paid an additional charge to ensure specialized safety measures to reduce the risk of damage to its cargo, the carrier's failure to perform those very measures which resulted in damage to the cargo has been found to be a sufficient basis upon which the liability limitation provision in the shipping agreement may be rescinded. The parties have not cited, and the Court has not found any contrary authority in this circuit, and the decisions of the Courts of Appeals for the First and Ninth Circuits are persuasive on this proposition. Indeed, at oral argument, counsel for the defendant said that essentially there would be no consequences for simply failing to supply to provisions that the plaintiff had paid for. This would be contrary to the reasoning of the decisions which I have already mentioned.

### B.

■ In the present case, Praxair specifically requested and paid for shipment by air-ride truck, including blanket wrapping of the APIMS cargo. According to the undisputed testimony of Norbert Hinze, blanket wrapping refers to an "extremely specialized service" involving wrapping the cargo in blankets and securing the crates to the side walls of the trailer. (*See* Mazaroli Aff., Ex. 1, (Hinze Dep.) at 20.) Hinze went on to explain that:

> Tariff 300 provides for highly specialized service, which is air ride, high-value, padded service. We received no padded service, no air ride due to four wheels missing on the trailer, shipment not being properly secured in the trailer or tied down, allowing it to slide all over the trailer. The reason we purchase and we use Mayflower is careful handling of a commodity, and we are paying an absolute premium for that kind of service, premium, high premium for that service, and we did not get that.

(*Id.* at 73.) Moreover, the notation "BLANKET WRAPPED" appears on the bill of lading under Special Instructions. (*See* Cebula Aff., Ex. B.) None of Praxair's contentions with respect to the special treatment requested for this shipment are contested or disputed.

Accordingly, Praxair's substantial allegations that Mayflower failed to provide the special safety measures specifically requested and paid for by Praxair present a genuine issue of material fact that, if decided in Praxair's favor, may constitute a breach of the shipping agreement, resulting in rescission of both the shipping contract and the limited liability protection afforded by the $5.00 per pound released rate under both the bill of lading and the tariff.

### III.

■ Therefore, I find that there is a genuinely disputed issue of material fact with respect to whether Mayflower failed to provide Praxair's special shipping requirements for the APIMS equipment by failing to provide the air-ride and blanket wrapped services for which Praxair asserts it paid an additional charge. If the finder of fact determines that Praxair did make such safety arrangements, and that Mayflower failed to provide them, and that the damage to the cargo was caused by the absence of such arrangements, Mayflower's actions in this regard may constitute a material breach of the terms of shipment. Such a breach would render Mayflower's liability limitation unenforceable. Accordingly, Mayflower's motion for partial summary judgment is **denied.**