David **HANSON** and Hanson Robotics, Inc., Plaintiffs,

v.

**AMERICA WEST AIRLINES, INC.; US Airways, Inc. and Does 1 to 20, inclusive, Defendants.**

**Case No. SACV 07–269 AG (RNBx).**

United States District Court, C.D. California.

March 29, 2008.

Edward W. Burns, Steven J. Freeburg, Freeburg Nettels and Schaldenbrand, Oceanside, CA, for Plaintiffs.

Jeffrey A. Worthe, Todd Christopher Worthe, Worthe Hanson & Worthe, Santa Ana, CA, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ANDREW J. GUILFORD, District Judge.

This Motion for Summary Judgment ("Motion") filed by Defendant U.S. Airways, Inc. ("Defendant") concerns whether contractual provisions bar recovery by an airline passenger suing for lost baggage. The Court finds that recovery is barred, and GRANTS the Motion.

### BACKGROUND

Plaintiff David Hanson ("Plaintiff") has lost his head. More specifically, Plaintiff has lost an artistically and scientifically valuable robotic head modeled after famous science fiction author Philip K. Dick ("Head"). Dick's well-known body of work has resulted in movies-such as *Total Recall, Blade Runner, Minority Report,* and *A Scanner Darkly,* and a large group of admirers has grown following his death in Orange County, California, in 1982. His stories have questioned whether robots can be human (*see, e.g., Do Androids Dream of Electric Sheep?* (1968)), so it seems appropriate that Plaintiff reincarnated Dick as a robot which included the Head, valued at around $750,000. (Motion 1:9–10.)

Plaintiff lost his Head on one of Defendant's planes when flying from Texas to San Francisco with a connection in Las Vegas. (Statement of Uncontroverted Facts and Conclusions of Law of Defendant, U.S. Airways Inc. in Support of Motion for Summary Judgment ("SUF") ¶ 1; Plaintiffs' Separate Statement of Genuine Issues in Opposition to Motion for Summary Judgment ("SGI") ¶ 1.) Plaintiff brought the Head onto the plane in a carry-on duffel bag and stored it in the overhead bin. Plaintiff fell asleep during the flight from Texas to Las Vegas, and woke up when the plane arrived in Las

Vegas. (Motion 1:22–25.) On waking, Plaintiff immediately left the plane to catch his connecting flight to San Francisco. (SUF ¶ 2, SGI ¶ 2.) Perhaps because he had just woken up, Plaintiff lacked the total recall to remember to retrieve the Head from the overhead bin.

According to Plaintiff, as soon as he got to San Francisco, he went to the baggage counter, spoke to Defendant's employee, Leanne Miller ("Miller"), and informed her of the problem. (Declaration of David Hanson ("Hanson Declaration") ¶ 3.) Miller told him that the airplane with his Head was in flight, and could not be checked until it landed in Southern California. (*Id.*) Plaintiff offered to fly to Southern California to regain his Head, but Miller told him not to do that. (*Id.*) According to Plaintiff, he informed Miller of the importance and value of the Head, and she replied that all efforts would be made to recover the Head and that it would receive "special treatment." (*Id.* at ¶¶ 4–5.)

Plaintiff asserts that about 45 minutes later, Miller called him with the good news that the Head had been found in Orange County. (*Id.* at ¶ 6.) Plaintiff "remained willing" to go retrieve his Head, but Miller replied that it would be sent to San Francisco. (*Id.*) According to Plaintiff, Miller then informed him of the special security procedures that would be taken to protect and deliver the Head. (*Id.*) Plaintiff told Miller that Plaintiff's friend Craig Grossman would be at the airport to pick up the Head. (Hanson Declaration ¶ 9.) Grossman waited for the Head at the San Francisco airport, but it never arrived and has not been found since. (Hanson Declaration ¶¶ 9–10.) While hearts may be left in San Francisco, heads apparently are left in Orange County, or are simply lost or stolen.

Plaintiff sued Defendant in California state court for conversion, negligence, and involuntary bailment. (Notice of Removal, Exhibit A.) Defendant removed the case to federal court, and here moves for summary judgment.

### LEGAL STANDARD

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If, and only if, the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See id.* at 322–23, 106 S.Ct. 2548. If the non-moving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.,* 210 F.3d 1099, 1103 (9th Cir. 2000).

### ANALYSIS

#### 1. CONTRACTUAL LIABILITY LIMITATIONS

Defendant argues that it contractually limited its liability for loss of Plaintiff's

goods, and that the limitation is effective because federal common law preempts any claims Plaintiff may have under state law. *Read–Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1195 (9th Cir. 1999). Plaintiff does not dispute that federal common law applies.

■ Federal common law allows a carrier to limit its liability for lost or damaged goods if the contract limiting liability offers the shipper (1) reasonable notice of the limited liability, and (2) a fair opportunity to buy higher liability. *Read–Rite*, 186 F.3d at 1198. The reasoning behind this doctrine is that a carrier "is entitled to base rates upon value and that its compensation should bear a reasonable relation to the risk and responsibility assumed." *Southeastern Express Co. v. Pastime Amusement Company*, 299 U.S. 28, 29, 57 S.Ct. 73, 81 L.Ed. 20 (1936). In other words, a carrier should be able to price its service according to agreed upon liability.

■ If the contract states the limited liability provision and a means to avoid it, the contract is considered prima facie valid. *Read–Rite*, 186 F.3d at 1198. Defendant has satisfied the elements of an enforceable limited liability provision under federal common law. The Contract of Carriage provides that "[l]iability of loss, delay, or damage to baggage is limited as follows unless a higher value is declared in advance and additional charges are paid." The contract later provides that the monetary limit is "USD 2,800.00 per ticketed passenger for checked baggage." More specifically for this case, the Contract of Carriage provides that Defendant "assumes no responsibility or liability for baggage, or other items, carried in the passenger compartment of the aircraft." Plaintiff admits that he was aware of the limited liability provision. (SUF ¶ 5, SGI ¶ 5.) Thus, Defendant provided Plaintiff with reasonable notice of limited liability and a fair opportunity to buy higher liabil-

ity. Since Plaintiff chose to carry his valuable Head onto the plane without additional protection, the Contract of Carriage bars his recovery.

## 2. PLAINTIFF'S ARGUMENTS

Plaintiff argues that Defendant is liable for the lost head because (1) there was a material deviation from the Contract of Carriage and (2) Plaintiff's discussion with Miller altered the terms of the original Contract of Carriage or created a new contract. The Court finds that Plaintiff is bound by the terms of the Contact of Carriage, and all Plaintiff's arguments fail.

### 2.1 Material Deviation Doctrine

Plaintiff argues that the limited liability provisions of the Contract of Carriage do not limit Defendant's liability for his loss because Defendant materially deviated from the original Contract of Carriage. (Opposition 5:18–21.)

At common law, "a geographic deviation from a scheduled voyage stripped a carrier of many of its defenses to liability and made the carrier the effective insurer of the goods that it was carrying." *Vision Air Flight Service, Inc. v. M/V National Pride*, 155 F.3d 1165, 1170 (9th Cir.1998). "Upon deviation from the scheduled voyage, a carrier was not permitted to rely upon exculpatory provisions in the bill of lading to avoid or limit its liability for loss or damage to cargo." *Id.* at 1170–71. The reasoning behind this doctrine was that when the carrier deviated from the agreed-upon voyage, "it was regarded to have exposed the cargo to such additional and unanticipated risk as to constitute a fundamental breach of the contract of carriage." *Id.* at 1171. The carrier could not then rely on exculpatory provisions.

■ Thus, the material deviation doctrine states that where a carrier effects a fundamental breach of a contract by mate-

rially deviating from the contract's terms, the carrier is liable for damage to or loss of the shipped goods. Cases have further defined the boundaries of this doctrine. For example, in *Nipponkoa Ins. Co., Ltd., v. Watkins Motor Lines, Inc.*, 431 F.Supp.2d 411 (S.D.N.Y.2006), a carrier promised to take special measures to protect a shipment of laptop computers, including using high security locks and video surveillance. The court found that the carrier breached that promise by failing to use either high security locks or video surveillance. *Id.* at 418. The court held that the carrier was responsible for the loss of the computers under the material deviation doctrine. The court explained that the doctrine applies when a carrier breaches a "separate, risk-related promise" about the shipment of goods. *Id.* at 418. The court emphasized that the agreement was specific and that the carrier deviated from the expressly agreed-upon security measures.

The California Court of Appeal similarly emphasized the limits of the material deviation doctrine in *Information Control Corp. v. United Airlines*, 73 Cal.App.3d 630, 140 Cal.Rptr. 877 (1977). In that case, the court found that the contract between the parties allowed the shipper to choose the particular flight for shipping its computer. *Id.* at 634, 140 Cal.Rptr. 877. The court then found that the carrier did not ship the computer on the chosen flight. *Id.* The court held that this deviation from the actual terms of the contract was a material deviation that subjected the carrier to full liability. Still, the court emphasized that not all failures to perform a shipping contract are material deviations. "[T]here is a shadowy line between the type of 'fundamental breach' which permits rescission coupled with reimbursement and the type of misconduct in the performance of the contract—whether labeled negligence or gross negligence—which restricts the shipper to the terms of the tariff." *Id.* at 641, 140 Cal.Rptr. 877.

The Ninth Circuit has likewise limited the material deviation doctrine. In *Vision Air*, for example, a carrier destroyed two trucks by using an inadequate pulley system to transport them. *Vision Air*, 155 F.3d at 1167–68. The Ninth Circuit held that even if that behavior constituted gross negligence or recklessness, it did not constitute a material deviation. "[W]e reject the notion that mere negligence may constitute an unreasonable deviation ... we reject the notion that gross negligence or recklessness may constitute an unreasonable deviation." *Id.* at 1175. The court emphasized that only "more culpable misconduct" could be considered a deviation. *Id.*

In the cases just discussed, the courts focused on the actual express terms of the agreement, showing that the material deviation doctrine applies only when the shipper makes a "separate, risk-related promise," and then breaches that promise.

With these boundaries, Plaintiff's argument that Defendant materially deviated from the original Contract of Carriage fails. There were no provisions in the original Contract of Carriage directly concerning transporting the Head. Indeed, the original Contract of Carriage disclaimed any responsibility for carry-on baggage. Further, nothing in the original Contract of Carriage made provisions for travelers leaving baggage on the airplane. Thus, Defendant did not breach a "separate, risk-related promise" in the original Contract of Carriage, and is not liable under this theory.

## 2.2 Altered or New Contractual Terms and Agency Law

Plaintiff also argues that Miller either altered the terms of the original Contract of Carriage or created a new contract with Plaintiff, and that Defendant is liable un-

der the new or altered contract. Plaintiff's arguments fail because Miller did not have the authority to alter or create a contract.

 Agents can bind their principals only if they have actual or apparent authority to do so. *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750, 755 (9th Cir.1969). Actual authority may be either express or implied. *Id.* If a principal specifically authorizes an agent to act, the agent has express authority to take that action. *Id.* If a principal "merely states the general nature of what the agent is to do, the agent is said to have implied authority to do acts consistent with the direction." *Id.*

Miller did not have express authority to contract with Plaintiff. The original Contract of Carriage provided that:

No employee of U.S. Airways has the authority to waive, modify, or alter any provisions of these terms of transportation or any applicable fares/charges unless authorized by a corporate officer of U.S. Airways. US Airways-appointed agents and representatives are only authorized to sell tickets for air transportation on U.S. Airways pursuant to the terms of transportation and applicable fares/charges of U.S. Airways.

There is no evidence that Miller was either a corporate officer of Defendant or that she was authorized by such an officer to modify the terms of transportation. Thus, under the Contract of Carriage, Miller had no express authority either to change the terms of the contract or to create a new contract. Indeed, Miller had express authority only to "sell tickets for air transportation." Likewise, there is no evidence that Miller had implied authority.

 The Contract of Carriage also leads to the conclusion that Miller had no apparent authority to change the terms of the contract or to create a new contract. "Apparent authority results when the principal does something or permits the agent

to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Hawaiian Paradise Park Corp.,* 414 F.2d at 756 (9th Cir.1969); *see also C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 479 (9th Cir. 2000). Only the acts of the principal, not of the agent, give rise to apparent authority. *See C.A.R. Transp. Brokerage Co., Inc.,* 213 F.3d at 479. Plaintiff argues that Miller's station behind a desk near the baggage claim area led Plaintiff to reasonably believe that Miller had the authority to make contracts for the delivery of lost baggage. The Court disagrees.

Plaintiff is a frequent flyer and was aware of the applicable tariffs. (SUF ¶ 5, SGI ¶ 5); *see also Deiro v. American Airlines, Inc.,* 816 F.2d 1360, 1366 (9th Cir. 1987) (finding that baggage liability limitations printed on the back of the airline ticket were reasonably communicated to travelers). Thus, before he lost his Head and spoke with Miller, he was aware of the tariff limiting Miller's authority. Aware of that tariff, he could not reasonably conclude, based on Miller's position behind a desk, that she suddenly had authority to contract with him.

A district court came to a similar conclusion in *Wittenberg v. Eastern Air Lines,* 126 F.Supp. 459 (E.D.S.C.1954). In that case, the plaintiff did not make his connecting flight after an agent of the airline promised that he would. *Id.* at 459. The plaintiff sued for damages, and the airline moved for summary judgment, claiming that its tariffs barred suit. There, like here, the airline company had tariffs providing that no agent had authority to alter the contract. *Id.* at 460. The court found that these tariffs were a complete bar to the plaintiff's action, because they prevented the plaintiff from relying on statements from the defendant's agent.

Here, as in *Wittenberg*, Plaintiff cannot rely on representations altering the contract or creating a new contract when those representations were made by someone whose authority had been expressly limited by contract. The Court must find that Miller had neither actual nor apparent authority to either alter the Contract of Carriage or create a new contract.

### 2.3 Even Under the New Terms Alleged, Liability Has Not Been Established

Even if Miller had authority to alter the Contract of Carriage or create a new contract, Defendant would still not be liable for the lost Head because there is no evidence that Defendant breached the contract even under the new terms alleged. Plaintiff alleges new terms that provided for tagging and boxing the Head, informing everyone of the value, and scheduling the Head on the next flight. But Plaintiff presents no evidence that such terms were breached. Instead, Plaintiff offers theories of Defendant's potential conduct, such as, "[p]otentially informing the wrong crew of the value of the HEAD" and "[p]otentially informing the thief of the high value of the HEAD." (Opposition 7:4–8.) These theories, while heady, are insufficient.

At best, Plaintiff's theory is that, since the Head did not arrive at its destination, Defendants must have done something wrong. This is not evidence of a breach or material deviation. Defendant may have done everything as promised, only to fall victim to a head hunting thief or other skullduggery. Alternatively, Defendant could have been negligent, and still not have committed a fundamental breach. *Vision Air*, 155 F.3d at 1175. The possibility of such negligence is "considered an inherent risk of shipping." *Information Control*, 73 Cal.App.3d at 641, 140 Cal. Rptr. 877. Thus, even if Plaintiff's discussion with Miller altered or created a new contract, there is no evidence establishing Defendant's liability based on breach or material deviation.

### 3. CONCLUSION

Philip K. Dick and other science fiction luminaries have often explored whether robots might eventually evolve to exercise freedom of choice. *See, e.g., 2001: A Space Odyssey* (a HAL 9000 exercises his freedom of choice to make some bad decisions). But there is no doubt that humans have the freedom of choice to bind themselves in mutually advantageous contractual relationships. When Plaintiff chose to enter the Contract of Carriage with Defendant he agreed, among other things, to limit Defendant's liability for lost baggage. Failing to show that he is entitled to relief from that agreement, Plaintiff is bound by the terms of that contract, which bars his state law claims.

The Court must GRANT Defendant's Motion. But it does so hoping that the android head of Mr. Dick is someday found, perhaps in an Elysian field of Orange County, Dick's homeland, choosing to dream of electric sheep.

IT IS SO ORDERED.