**NIPPONKOA INSURANCE CO., LTD., Plaintiff,**

v.

**WATKINS MOTOR LINES, INC., Defendant.**

**No. 05 CIV. 5596(PKC).**

United States District Court, S.D. New York.

May 16, 2006.

David T. Maloof and Thomas M. Eagan, Maloof Browne & Eagan LLC, Rye, NY, for Plaintiff.

Watkins Motor Lines, Inc., R. Brett Kelly, Hyman Hillenbrand, DeOrchis & Partners, LLP, New York City, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CASTEL, District Judge.

This action was commenced on June 15, 2006 by NipponKoa Insurance Company, Ltd. ("NipponKoa") against Watkins Motor Lines, Inc. ("Watkins"), asserting that NipponKoa is the insurer of two shipments of laptop computers owned by Toshiba America Information Systems, Inc. ("TAIS") that were lost while in the possession and control of Watkins. Watkins is a contract carrier within the meaning of the Carmack Amendment, 49 U.S.C. § 14706, and there is federal question jurisdiction, 28 U.S.C. § 1331. (Compl. ¶ 1) All discovery in this action closed on March 15, 2006. (Docket No. 13)

The trial of this action was held on May 2, 2006 by the Court sitting without a jury. The parties offered into evidence declarations, exhibits and excerpts from depositions which, by agreement, were received without objection on foundation or hearsay grounds. No live witnesses were called by either side. Certain facts are the subject of a stipulation set forth in the Joint Pretrial Order ("JPTO"). Set forth herein are my findings of fact and conclusions of law.

At the outset, I note that defendant "admits that Watkins breached its contractual obligations owed to TAIS, and such breach was the direct cause of loss ...." (Answer ¶¶ 12, 23) There is no dispute that the agreement between the parties contains a limitation of liability clause and the parties agree that, if it applies to the losses, then the total amount of plaintiff's losses is $44,275. The parties also agree that, if the contractual limitation does not apply, then the amount of plaintiff's losses is $179,957.76. For the reasons set forth herein, I conclude that the losses were the result of material deviations under the contract of carriage and, under familiar principles applicable in cargo cases, the limitation of liability does not apply.

### A. Findings of Fact

Watkins has a terminal facility located on Delancy Street in Newark, New Jersey ("Terminal"). The facility is surrounded by a fence approximately 8 feet in height. Vehicle access is controlled by a guard at a gate. There is also a pedestrian gate with key pad access. There is a perimeter beam system with digital monitoring of the gates. (JPTO ¶ 12)

The Terminal consists of 101 loading docks on a 50 foot wide platform with adjacent office. The Terminal operates from noon Sundays until Saturday at approximately 2:00 a.m. A security guard patrols the grounds during the hours the Terminal is not operating. (JPTO ¶ 13)

Closed-circuit television ("CCTV") cameras pan the area of the loading docks. The CCTV coverage does not focus on an individual unloading dock, and, thus, does not monitor a truck throughout the period of unloading. (JPTO ¶ 13)

On or about May 25, 2004, TAIS delivered to Watkins in Irvine, California, a consignment of laptop computers and accessory parts for delivery to TAIS' cus-

tomer Synnex Information ("Synnex") in Edison, New Jersey (the "May Shipment"). (Answer ¶ 9) The May Shipment was carried by Watkins to its Newark Terminal and was received on June 1, 2004. The May Shipment was sent out for delivery later that day. (Braswell Dep. Ex. 4) Watkins has no record of delivering the May Shipment to Synnex. The May Shipment was never delivered to TAIS' customer. (Answer ¶ 10) Watkins did not notify TAIS that the May Shipment was missing.

On or about September, 24, 2004, TAIS again delivered to Watkins in Irvine a consignment of laptop computers for delivery to Synnex (the "September Shipment"). (Answer ¶ 20) The September Shipment was carried by Watkins to the Newark Terminal arriving on September 29, 2004. Watkins unloaded the September Shipment and reloaded it onto another trailer. That trailer remained at the loading dock until October 8, 2004. (Braswell Dep. Ex. 12) The September Shipment was never delivered to TAIS' customer. (Answer ¶ 22) Watkins never notified TAIS that the September Shipment was missing.

The respective obligations of the parties are set forth in a "Transportation Agreement" dated December 10, 2003. (PX 1) It is a 10–page written contract (plus two appendices) that provides for Watkins to supply TAIS with nationwide transportation services (the "Agreement"). Because of the high-end value of the individual items of cargo—laptop computers—security was addressed in the contract in the form of an Appendix B which set forth Minimum Security Guidelines. The Agreement also provided that Watkins would obtain insurance for the benefit of TAIS with TAIS named as a loss payee. (PX 1 at ¶ 11)

The Agreement contains a merger clause (PX 1 at ¶ 22) and provides that

California law governs (PX 1 at ¶ 16). It provided that the "Carrier [i.e. Watkins] assumes the liability of a common carrier consistent with the Carmack Amendment for the shortage, loss, damage or delay of cargo from receipt until actual delivery of the cargo to consignee." (PX 1 at ¶ 12) It also contained a broad limitation of liability provision for lost or damaged cargo:

Shortage, damage and loss include, but are not limited to, the mysterious disappearance or loss caused by negligence of the Carrier, its officers, employees, agents, subcontractor or independent contractors. The amount of the Carrier's liability shall be release value up to $25.00 per pound per article or $100,000.00 per shipment whichever is lesser for each bill of lading.

(PX 1 at ¶ 12.1) Plaintiff argues that the losses were caused by material deviations from the terms of the Agreement, and, therefore, the limits of liability do not apply.

Plaintiff paid TAIS the sums of $46,038.52 for the loss of the May Shipment on or about September 13, 2004, and $172,704.40 for the loss of the September Shipment on March 16, 2005. (Stockton Trial Decl. ¶¶ 12, 20) TAIS then executed subrogation receipts showing such payment. (Pl.Exs.8, 14) "Under settled principles, an insurer in its role as subrogee has no greater rights than those possessed by its insured, and its claims are subject to the same defenses." *Employers Mut. Liab. Ins. Co. v. Tutor–Saliba Corp.*, 17 Cal.4th 632, 639, 71 Cal.Rptr.2d 851, 951 P.2d 420 (Cal.1998) (quoting *Liberty Mut. Ins. Co. v. Fales*, 8 Cal.3d 712, 717, 106 Cal.Rptr. 21, 505 P.2d 213 (1973)).

1. *Minimum Security Guidelines*

The Agreement contains an Appendix B that sets forth specific security precautions to be undertaken by Watkins. The parties

expressly agreed that these security guidelines were "material" and no deviation therefrom was permitted. (PX 1 at ¶ 6) Watkins' District Manager in charge of the Newark Terminal was Paul Braswell who testified that he never received a copy of the Minimum Security Guidelines. (Braswell Dep. at 13)

The Minimum Security Guidelines provided at ¶ 4 as follows:

> In the event that TAIS freight must be stored at the carrier's premises for more than four (4) hours, the carrier will secure the freight in a restricted and secured access area that meets the following minimal guidelines. Examples of secure storage may include sealed or locked containers, locked cages, and locked hard-wall areas.

> \* \* \* \* \* \*

> 4.5. Storage of TAIS product in trailers outside the building should be used only as a last resort. If a trailer has to be used, the carrier agrees (in addition to the above requirements) to use high-security locks on the trailer door . . . .

Fairly read in context and giving the words their plain and ordinary meaning, the cargo may be kept in a restricted and secured access area or, "as a last resort," the cargo may be stored in "trailers outside the building" and, in that event, a "high security lock[ ]"is to be placed on the trailer. It is undisputed that the cargo was kept in an outdoor trailer and there is no evidence in the record from which one could conclude that this was done after consideration of any other form of storage. Thus, I conclude it was not done "as a last resort". The storage of the May and September Shipments in an outside trailer without prior consideration of other alternatives was a material deviation from the terms of the contract and likely contributed to the losses.

As noted, the Minimum Security Guidelines provide that if the cargo was stored in a trailer "outside the building", then a "high-security lock[ ]" must be "use[d]" on the trailer. Braswell testimony was internally contradictory as to whether the trailers were locked. At one point he testified that the trailers were locked with a large padlock manufactured by "Master". (Braswell Dep. at 37–38, 41–42) Later, he testified that the high value cargo could be stored in a trailer that was *either* padlocked *or* sealed:

> Q. For high value cargo, was there a particular method that was used to secure it?

> A. Padlock or seal.

> Q. Either [/]or was the practice?

> A. That's all cargo.

> Q. I'm sorry?

> A. All cargo is padlocked or sealed.

> Q. There were no special requirements for high value cargo?

> A. All cargo is padlocked or sealed.

(Braswell Dep. at 99–100). *See also* PX 23 at 3.

Sealed means a bolt seal was placed on the container and such a seal can be cut with a bolt cutter. (Braswell Dep. at 53–54) I find that it is not the equivalent of "high-security locks". (PX 25 at 8) I conclude that this was a material deviation from the contractual provisions and that the absence of a uniform practice of applying a high security lock to TAIS cargo in an outside trailer was a likely cause of the losses.

The Minimum Security Guidelines also required closed circuit video monitoring of the cargo:

> 4.3. The area must be under constant CCTV coverage. The CCTV coverage must be capable of recording the identity of all individuals accessing the area. Recordings must be kept a minimum

thirty (30) days. Lighting must be sufficient to ensure adequate recording.

Watkins admits that:

> [Watkins] CCTV coverage would not have been able to photograph these shipments since they were palletized, and all that would be seen would be forklifts moving the pallets off the truck and out of camera range. Cameras at such facilities pan dock areas, and do not focus in on any particular truck. *There is no CCTV coverage focusing on each unloading dock, and on each trailer as it is unloaded* because all that would be seen would be forklifts going into the truck and out of the truck carrying pallets, and moving out of range of the camera. As such, no meaningful security would be provided and, as related to these shipments, it could not be determined from such cameras that any shipments were in fact removed from a truck, or loaded onto another truck because it would be impossible to recognize the shipments. All that would be seen would be pallets of shrink-wrapped merchandise.

(PX 22, ¶ 4(b)) (emphasis added).

Watkins breached the contractual requirement that the "video must cover all areas where TAIS assets are present," and that the system must "allow continuous security monitoring and protect TAIS' freight against … theft." (PX 1, App. B, ¶ 2.1) *See also* Wilkins Decl. at 7–9. This was a material deviation from the contractual requirements that likely was a contributing cause to the losses.

### 2. *Insurance*

The Agreement contained an express obligation on the part of Watkins to obtain cargo liability insurance naming TAIS as loss payee:

> 11. *Insurance and Investigation.* Carrier shall place into effect and carry during the term of the Agreement cargo liability insurance, from an insurance carrier rated at least "A" by *Best's Rating Guide*, with TAIS as loss payee, without regard to any limitation of liability, and comprehensive general liability insurance of at least $1 million per occurrence and $2 million general aggregate limit.

(PX1 at ¶ 11)

Watkins admits that it can find no record of naming TAIS as a "loss payee" on the cargo policy it maintained. (PX 22 at ¶ 1) Fairly read in context, the Agreement required that Watkins arrange for cargo insurance in which a covered loss would be paid directly by the insurer to TAIS. The policy limits would be at least $1 million per occurrence ($2 million aggregate) and the contractual limitations of liability would not apply to such insured losses. The failure to maintain such a policy was a material deviation from the contract and it was a direct cause of the losses. While it did not cause the May and September Shipments to be lost, the absence of the contractually-mandated coverage caused the economic consequences thereof to be suffered by TAIS and, in turn, its own insurer.

### B. *Conclusions of Law*

In the Agreement, the parties stipulated that Watkins "assumes the liability of a common carrier consistent with the Carmack Amendment for the shortage, loss, damage or delay of cargo from receipt until actual delivery of the cargo to consignee." (PX 1 at ¶ 12) Therefore, the extent and scope of Watkins' liability for the losses of the May and September shipments is governed by the Carmack Amendment. The Amendment provides, in relevant part, as follows:

> A carrier providing transportation or service subject to jurisdiction under

chapter 135 may enter into a contract with a shipper ... to provide specified services under specified rates and conditions. If the shipper and carrier, in writing, expressly waive any or all rights and remedies under this part for the transportation covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies. The parties may not waive the provisions governing registration, insurance, or safety fitness.

49 U.S.C. § 14101(b)(1). This language allows the parties to a contract to limit their respective liability, and TAIS and Watkins did so in Paragraph 12.1 of the Agreement. Although Watkins contends that this ends the analysis, Nipponkoa asserts that such a liability limitation provision does not protect a carrier where the loss is a result of a "material deviation" from the contract of carriage.

■■■ The "material deviation" doctrine originated in admiralty law, and it provides that a fundamental deviation from a shipping contract may make a liability limitation unenforceable. *Pioneer Imp. Corp. v. The Lafcomo*, 159 F.2d 654 (2d Cir.1947), *cert. denied*, 331 U.S. 821, 67 S.Ct. 1310, 91 L.Ed. 1838 (1947); *The Sarnia*, 278 F. 459 (2d Cir.1921), *cert. denied*, 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797 (1922). For example, in *Pioneer Imp. Corp.*, the Second Circuit concluded that the carrier "deviated fundamentally from the agreed method of transportation" when it failed to stow the shipment at issue with tarpaulins, as expressly provided in the contract, and the shipment was ruined by "inundating sea water." 159 F.2d at 655. The court held that the carrier was "therefore deprived of the benefit of the [liability] limitation clause" in the contract. *Id.* (citing *St. Johns. N.F. Shipping Corp. v. S.A. Companhia Geral Commercial do Rio de Ja-*

*neiro*, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923)). Similarly, a carrier who stows cargo on deck when the contract expressly provides that it is to be stowed below deck loses the benefit of a liability limitation clause when the cargo is damaged by such a deviation. *Sarnia*, 278 F. at 466.

Courts have rejected the "[w]holesale importation" of the "material deviation" doctrine from admiralty to overland or airborne shipping. *Praxair. Inc. v. Mayflower Transit, Inc.*, 919 F.Supp. 650, 654 (S.D.N.Y.1996) (collecting cases). The Second Circuit refused to apply the doctrine to a contract provision limiting an airline's liability for the loss of a passenger's jewelry in checked baggage. *Lichten v. Eastern Airlines*, 189 F.2d 939, 941–42 (2d Cir.1951) (relying on the "far-reaching effect of the principle of uniformity of treatment" in tariffs, such as the one containing the relevant exemption, filed with the Civil Aeronautics Board). *See also Tishman & Lipp. Inc. v. Delta Air Lines*, 413 F.2d 1401, 1404–05 (2d Cir.1969) (employing similar reasoning). More recently, a court in this District rejected a customer's argument that a violation by the United Parcel Service of "standard delivery procedure constitutes a material breach of the contract of carriage and thus justifies rescission of the entire contract." *Rafaella Gallery, Inc. v. United Parcel Serv., Inc.*, 818 F.Supp. 53, 54 (S.D.N.Y.1993).

In *Praxair*, Judge Koeltl reviewed the application of the "material deviation" doctrine to the Carmack Amendment and summarized the case law thusly:

[I]n cases of shipments by air, rail and truck where the shipper paid an additional charge to ensure specialized safety measures to reduce the risk of damage to its cargo, the carrier's failure to perform those very measures which resulted in damage to the cargo has been found to be a sufficient basis upon which

the liability limitation provision in the shipping agreement may be rescinded. 919 F.Supp. at 656. In other words, a carrier must have made a "separate, risk-related promise (special to the particular shipment at issue)" to allow a shipper to avoid a liability limitation under the material deviation doctrine. *Hill Constr. Corp. v. Am. Airlines, Inc.*, 996 F.2d 1315, 1319 (1st Cir.1993) (Breyer, C.J.). *See also Sarnia*, 278 F. 459 at 463 ("In fixing the value the shipper was undoubtedly influenced by the fact that the goods were to be carried below deck, and not exposed to the perils of carriage above deck."). However, when a carrier makes no such promise, liability limitation provisions of the contract apply. *Compare Krystaltech Int'l Inc. v. Am. Int'l Freight, Inc.*, 2000 WL 502865, *5, 2000 U.S. Dist. LEXIS 5442, *13–15 (S.D.N.Y. Apr. 26, 2000) ("The fact that [goods] were shrink-wrapped and marked 'Do Not Unwrap' does not create an exemption from a limitation of liability.") *with Praxair*, 919 F.Supp. at 656 (holding that a genuine issue of material fact existed due to evidence that customer "specifically requested and paid for shipment by air-ride truck, including blanket wrapping . . .[, which was] an 'extremely specialized service' . . .").

■ In this case, TAIS sought and obtained several special provisions in the Agreement in order to enhance the security of the high-value goods it entrusted to Watkins and protect the value of its property in the event of a loss. TAIS contracted for Minimum Security Guidelines to address its concerns about the possibility of theft or other loss of goods such as the May and September shipments. Each of the Minimum Security Guidelines as to which I have found a material deviation was a "separate, risk-related promise," as explained by the First Circuit in *Hill Constr*, and Judge Koeltl in *Praxair*. I conclude that the "material deviation" doctrine applies to the Agreement.

■ I have found, as trier of fact, that several violations of the Agreement constituted "material deviations" and thus nullified the liability limitation provision in Paragraph 12.1 of the Agreement. First, Watkins did not store the goods in either the May or September shipments in a "secured access area". (Minimum Security Guidelines ¶ 4). Rather, Watkins stored the goods in an outside trailer, and this was not done "as a last resort." (Minimum Security Guidelines ¶ 4.5) Second, Watkins secured the shipments in these trailers with bolt seals instead of "high-security locks." (Minimum Security Guidelines ¶ 4.5) Third, Watkins did not provide security video monitoring that "cover[ed] all areas where TAIS assets [were] present" (Minimum Security Guidelines ¶ 2.1), nor did Watkins provide "constant CCTV coverage . . . capable of recording the identity of all individuals accessing the area" (Minimum Security Guidelines ¶ 4.3).

The contractual provision requiring Watkins to carry cargo liability insurance naming TAIS as a "loss payee" was not a measure designed to reduce the risk of loss of the cargo. But it was intended to reduce the economic consequences of a loss of cargo. The parties expressly contemplated that the insurance would cover a loss "without regard to any limitation of liability . . . ." This makes perfect commercial sense. Ordinarily, the carrier's liability is capped by the limitation of liability, absent a material deviation in the contract of carriage. It is understandable that the shipping party would want financial protection up to the full value of the loss. Presumably, the rates charged to TAIS by Watkins reflected the fact that Watkins would be securing such coverage from an "insurance carrier rated at least 'A' by *Best's Rating Guide*." That TAIS may also have secured coverage from Nipponkoa does not affect the liability of Watkins

for failing to secure the contractually-required coverage. Given the apparent purpose of the cargo liability insurance provision was to protect the shipper against the economic consequences of a loss above the limitation of liability, it makes sense that the material deviation doctrine would apply to a complete failure to obtain the contractually-required insurance. *See De Laval Turbine, Inc. v. West India Industries*, 502 F.2d 259, 270 n. 16 (3rd Cir. 1974).

These violations constituted material deviations from the provisions of the Agreement. Therefore, the liability limitation provision in Paragraph 12.1 of the Agreement does not apply and defendant is liable for $179,957.76 in damages.

### C. *Attorneys' Fees*

■ At the close of trial, I requested that the parties submit post-trial briefing on the issue of plaintiff's asserted entitlement to attorneys' fees. Plaintiff submitted a letter and accompanying declaration that specified, in detail, the basis for plaintiff's request for attorneys' fees and disbursements in the sum of $69,167.50. (Eagan Letter of May 5, 2006 at 1) In this letter, plaintiff simply stated, "The contract provides for payment of attorneys fees and costs in favor of" TAIS and cited Paragraph 23 of the Agreement in support. (*Id.*) This paragraph provides, in part, as follows:

> Carrier shall defend, indemnify and hold harmless TAIS, its directors, officers, employees and agents, against and from any and all loss, cost, liability or expense (including reasonable attorney's fees) that any of them may incur or be subject to as a result of any demand, claim, action or proceeding arising out of or in connection with Carrier's loading, handling, transportation, unloading or delivery of any shipment hereunder, or Car-

rier's breach of any provisions of this Agreement.

(Pl.Ex. 1 ¶ 23).

Despite plaintiff's summary assertion that this provision entitles it to attorneys' fees, no language in Paragraph 23 of the Agreement addresses the payment of attorneys' fees in an action between these parties or their assigns. Plaintiff claims no ambiguity in the language and has offered no parol evidence. The provision provides that Watkins will "defend, indemnify and hold harmless TAIS, its directors, officers, employees and agents" in certain circumstances. (*Id.*) While these circumstances are broadly phrased, fairly read, the payment of "loss, cost, liability or expense (including reasonable attorney's fees)" applies only to situations in which TAIS is defending against a third party's "demand, claim, action or proceeding." (*Id.*) Had Synnex asserted a claim against TAIS that TAIS was required to defend or pay, then Watkins would have been liable for the associated attorneys' fees. But, here, the insurer of TAIS has asserted a claim against Watkins, and no party has asserted a claim against TAIS. I conclude that paragraph 23 does not apply.

Plaintiff has failed to demonstrate its entitlement to attorneys' fees and therefore none will be awarded.

### D. *Interest*

■ Plaintiff argues that it is entitled to prejudgment interest of ten percent per annum on a compounded basis—the rate provided by Section 3289(b) of the California Civil Code—because TAIS is headquartered in California and both shipments at issue originated in California. If jurisdiction existed in this case by reason of diversity of the parties, 28 U.S.C. § 1332, then New York choice of law rules would apply and it is possible that California substantive law would determine the

420

rate of prejudgment interest. *Cf. Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir.1999) (holding that Florida law would have determined prejudgment interest if defendant had not waived the argument).

 Instead, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 because a federal question—the interpretation of the Carmack Amendment—was presented. (Compl.¶ 1) In such circumstances, "[t]he decision whether to grant prejudgment interest and the rate used if such interest is granted 'are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion.'" *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071–72 (2d Cir. 1995). *See also Atl. Mut. Ins. Co. v. Napa Transp., Inc.*, 399 F.Supp.2d 523, 525 (S.D.N.Y.2005) ("[F]ederal law governs the issues of appropriateness, timing, and rate of prejudgment interest."). I adopt the New York method of calculating interest, which is nine percent per annum, on a simple, rather than compounded, basis. N.Y. C.P.L.R. § 5004 (McKinney 2005). *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir.1998) (citing *Patane v. Romeo*, 235 A.D.2d 649, 652 N.Y.S.2d 142 (3d Dep't 1997)). "Interest shall be basis." N.Y. C.P.L.R. § 5004 (McKinney 2005). *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir.1998) (citing *Patane v. Romeo*, 235 A.D.2d 649, 652 N.Y.S.2d 142 (3d Dep't 1997)). "Interest shall be computed from the earliest ascertainable date the cause of action existed ...." N.Y. C.P.L.R. § 5001(b).

*CONCLUSION*

The Clerk of Court shall enter judgment in favor of plaintiff as against defendant in the amount of $41,852.20 plus simple interest at the rate of 9% per annum running from June 1, 2004, and $138,105.56 plus simple interest at the rate of 9% per annum running from October 8, 2004. All other relief requested by any party is denied.

SO ORDERED.